Garvey Martin **CHEEK**, Petitioner,

v.

**UNITED STATES of America,**
**Respondent.**

Nos. 5:92CV116–P,  ST–CR–84–15–01–P.

United States District Court,
W.D. North Carolina,
Statesville Division.

Jan. 10, 1995.

David Rudolf, Chapel Hill, NC, for petitioner.

Kenneth D. Bell, Chief Asst., U.S. Atty's Office, Charlotte, NC, for respondent.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

The matter before the Court arose on a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 filed September 30, 1992. The petition included a statement of facts involving an extra judicial contact with a juror in 1984 during the trial of the captioned action. The contact with the juror was never reported to the Court by the juror or anyone else.

On January 28, 1993 the Government filed a response in which it agreed that an evidentiary hearing was appropriate and stipulated that *if* the facts were established as alleged in the petition that an order for a new trial should issue from the Court (emphasis added).

The Magistrate Judge scheduled a hearing for April 27, 1993. A motion filed by petitioner April 4, 1993 requesting a continuance was granted.

On May 26, 1994 the Government filed a supplemental response in which it stated that following its independent investigation it stipulated that the facts were as alleged in the petition and that based on the authority set forth in Petitioner's Memorandum of Law the Government stipulated that an order for a new trial should issue.

Nothing further appeared in the file until September 7, 1993 when the Government filed a motion to withdraw its Supplemental Response asserting that there exists a conflict of authority within the Fourth Circuit as to which party had the burden of proof on the issue of prejudice, citing *U.S. v. Malloy,* 758 F.2d 979 (4th Cir.), *cert. denied,* 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985). The Government sought to file a brief followed by a hearing.

On September 14, 1993, the petitioner filed a response opposing the Government's motion to withdraw its stipulation that petitioner was entitled to a new trial.

The Magistrate Judge then filed an order scheduling the hearing for October 15, 1993.

The Government filed, on September 28, 1993, its brief in support of the motion to withdraw. The petitioner filed his response on October 13, 1993. The hearing was held on October 15, 1993 and an order filed by the Magistrate Judge on October 28, 1993 denying the Government's motion to withdraw its supplemental response.

The Government filed on November 5, 1993 notice of appeal from the order of the Magistrate Judge. The petitioner filed on November 15, 1993 a response.

The Magistrate Judge's denial of the Government's motion filed October 28, 1993, made no mention of an evidentiary hearing on the facts supporting the petition for a writ of *habeas corpus.* In any event, the Magistrate Judge made no findings of fact, and the Court must therefore assume no evidence was produced.

The petitioner is urging this Court to deny the appeal and put the Government to the burden of a retrial of a trial held over ten years ago. This Court believes the public interest deserves more from the Government than an agreement that facts are as set forth in a petition rather than having a hearing and allowing the Court to make that determination from the testimony and evidence before it.

This Court has now held such a hearing.

Without an evidentiary hearing and testimony by the juror involved, the Court would have no way of determining whether the contact in this case cast any doubt on the validity of juror Davis' verdict. As it turns out juror Davis stated that he considered all the evidence in reaching his own personal verdict.

The petitioner contends in his response to the Government's notice of appeal from the Magistrate Judge's order filed November 15, 1993 "... that an order of a magistrate judge on a non-dispositive pre-trial motion may be rejected by this Court only if it is clearly erroneous or contrary to law."

The petitioner overlooks 28 U.S.C. § 636(b)(1)(C) which provides in pertinent part:

A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

This Judge determined that it should receive further evidence since apparently none was received by the Magistrate Judge.

The Court will first summarize in narrative form the testimony of the witnesses who testified at an evidentiary hearing held by this Court on October 21, 1994.

## I. *NARRATIVE OF TESTIMONY AT EVIDENTIARY HEARING*

### A. *Testimony of Oren Alexander on Direct Examination by Defendant's Attorney*

Oren Alexander is a bail bondsman and has been in Charlotte, North Carolina for thirty-seven years and in 1984 had an office at 328–A North Brevard Street. He became acquainted with one Babe Pennell by writing bonds for him and his employees. Pennell was a bootlegger selling non-tax paid liquor (Tr. pp. 8 & 9). Pennell was a friend of Alexander's, "He gave me a lot of business" (Tr. p. 16, lines 3–4).

Alexander became acquainted with Dot Stewart by writing bond for her shoplifting charges. He has known her for about 40 years. In July of 1984 he was asked by either Babe Pennell or Dot Stewart to find a young black male involved in a court case. (Tr. pp. 9, 10, 11).

Alexander testified that he "may" have told the government agents investigating this matter that he was told by Pennell or Stewart that they wanted to talk with the young black male who was a witness in a court case. Alexander went to Stewart's house in response to a telephone call and was given "this person's" name and address on a piece of note paper and was asked by Stewart or Pennell to have "this person" to come by Alexander's bail bonding office. (Tr. pp. 11 & 12).

Alexander went to "this person's" apartment at 5:00 or 6:00 o'clock in the evening. Alexander asked the person whether the name on the piece of paper was his name. Alexander did not remember if the name on the paper was that of Michael Davis, but Alexander asked him to come to his office later that evening at 8:00 o'clock. The person did not ask for what, but did ask Alexander who wanted to speak to him and Alexander told him "a friend of mine." (Tr. pp. 12–14).

Alexander told the young black male that a friend of Alexander's wanted to talk to him. Neither Dot Stewart nor Babe Pennell told Alexander they had spoken with "this person" before. (Tr. pp. 14–16).

Alexander did not put "the person" in his car when he went to "this person's" house. (Tr. p. 16). (There is not any dispute that "this person" or "the young black male" whom Alexander referred to is juror Davis.)

Alexander testified that this person, who was a young black male, came to Alexander's office about 8:00 o'clock p.m. and that he (Davis) drove there. He (Davis) had a car. (Tr. p. 17).

When Alexander arrived at his office a white heavy fellow driving a white cadillac was there. Alexander's statement to Agent Barrier and Agent McKnight had been that a short time after this young black male arrived at Alexander's office by himself driving the car Alexander had seen earlier and that a short time after the young black male arrived, Dot Stewart and an unidentified white male arrived at his office. At the hearing, Alexander testified that "I think the white male was there first." The white male told Alexander he was from Winston–Salem and he wasn't supposed to be out at this time of night. (Tr. pp. 17–18).

Alexander testified he saw Stewart with a bag and he *presumed* there was money in it (emphasis added). He had told the agents

he saw her with a sack with some money in it. (Tr. p. 19).

There was some conversation between the white male and the young black male. (Tr. p. 19).

Alexander told the agents that he heard the white male tell the black male, "I saw you today, I was at the same place you were." (Tr. p. 19).

Alexander further testified that it was "probably so" that the white male asked if Alexander would leave him and the black male alone. (Tr. p. 20).

Alexander testified that he and Stewart left the room where the white male and Davis were alone in the back room and he and Stewart were in the front room. A short while later, Alexander testified that the young black male exited the rear office. (Tr. pp. 20–21).

Then the following series of leading questions by petitioner's attorney and Alexander's answers occurred:

Q. And as he passed you by, he told you that he couldn't do what the white male wanted him to do.

A. He was upset. I don't remember everything that was said. I got upset when I found out what was trying to take place.

Q. When you say "he was upset," he appeared how?

A. He didn't know what he was there for, and he was shocked to know that.

Q. Didn't he tell you that white male wanted him, quote, "to do something with the jury"?

A. I asked him what he wanted, and I think he replied to that.

Q. What he said was he wanted him to do something with the jury?

A. Probably so.

Q. And then that black male said something about him being on the government's side, something like that.

A. He may have said that.

Q. And after—and the black male then went outside, left?

A. Pardon? I didn't hear you.

Q. After the black male said, "They wanted me to do something with the jury," and he was on the government's side, he then left?

A. Yes, he left.

Q. And after he left, you asked Miss Stewart what was going on, didn't you?

A. I think I did.

Q. And you were told that the white male was trying to do something with the jury by Miss Stewart, correct?

A. Maybe so. I got pretty upset about it. When you get upset, I can't remember when I get upset and nervous.

Q. The reason you got upset is because there was a bribe attempt of a juror going on in your office, right?

A. I think they was trying to attempt it, yes.

Q. You didn't like that?

A. No, I didn't like that.

Q. You understood that that was a serious offense, correct?

A. Well, I know it's not the proper thing to do.

Q. And you sure didn't want to be a part of that, did you?

A. No, sir.

Q. Did you get angry then at Miss Stewart and this white male?

A. I got angry at everybody.

Q. You felt they put you in a bad position?

A. Yes, sir.

Q. Did you throw them out of your office?

A. No. No, I didn't throw anybody out. I didn't like what was going on. I was angry about it.

Q. You knew it was wrong to try and bribe a juror?

A. Yes, sir, I knew that.

MR. RUDOLF: Nothing further, Your Honor. (Tr. pp. 21–23).

**B.** *Cross–Examination—Oren Alexander*

On cross examination Oren Alexander testified as he recalled that he did not tell the young black male who wanted to see him or

why, but he "may" have. Alexander then testified that the young black male "may" have asked why somebody wanted to see him and Alexander said: "A fellow wants to talk to you", and that Alexander was told it happened in 1981 and then he was told it was 1982 and that he learned today it was 1985. (Tr. p. 23). Alexander was told by someone who came to his office four or five years ago investigating "this thing," said it was '81 or '82. Alexander testified it was the fellow sitting close to the lawyer (Rudolph) and that he said he was from Raleigh or somewhere. He was the same one who came to his office with Mr. Rudolph a few weeks ago. When he came four or five years ago asking about this matter he asked Alexander if he knew Sherry Brown and Ace Rivers and that crowd and he identified himself as a private investigator from Raleigh and told Alexander all of this happened in 1981 or 1982. (Tr. p. 24).

Alexander testified he would have probably told the young man (juror Davis) Pennell had wanted to see him, if he asked, and that he probably did ask. Alexander further testified that he was quite sure the young man (Davis) didn't have any idea who Babe Pennell was. He further testified that he did not drive the young man (Davis) to his office. Alexander further testified that when he was called over to Stewart's home that she, Babe Pennell, and another white male were there, and that the white male was not the same man who was at his bonding office later that evening. (Tr. p. 25).

Alexander testified that when he was shown a photo spread by the Government's agent and asked if he could pick anybody who was in his office out of the photo spread he was unable to identify anybody in that lineup as having been in his bonding office. (Tr. p. 26).

Alexander testified that he saw Stewart with a brown paper bag and took it for granted there was money in it but that he did not see any money and that nobody told him there was money in it. (Tr. p. 26).

Alexander testified he "may" have heard the white male in his office talking to the young black male he had found and that he "may" have heard "that they saw me today or something to that extent." Alexander further testified that he "may" have heard some of the things the young black male and white male said, that they were in another room from where he and Stewart were and that the door "may" have been closed. He further testified the young black male "may" have said he was on the Government's side and that the young black male said something to let Alexander know he was a juror or knew about the case. (Tr. p. 27).

Whatever the young black male said, Alexander took it that he was a juror and not a Government employee. (Tr. pp. 27–28).

Alexander became upset and came to find out that somebody had used his office to try to bribe a juror. He did not know whether it was State or Federal, but he never told any law enforcement person about what happened until the Government agents investigating the matter for the U.S. Attorney's Office came to talk to him. Alexander did not think he had any reason to tell law enforcement. He did not feel he had any responsibility to tell anyone about it. When the Government agents did come to see Alexander on January 20, 1993, he told them he did not want to answer their questions without his lawyer present. (Tr. pp. 28, 29, 30).

Alexander "thinks" his attorney asked about whether Alexander could be prosecuted about what he said in the interview. Alexander was concerned about knowing whether he could be prosecuted for what happened in his office and in his presence that night. He did not want to answer any questions about it as long as he thought he might be prosecuted. Other than the investigator from the U.S. Attorney's Office and Mr. Rudolph and the investigator he brought with him he had told an investigator three or four years ago. That investigator came back when the lawyers came to his office. That investigator told him he was from Raleigh. (Tr. pp. 30, 31).

On redirect by Rudolph, Alexander testified that he was quite sure, almost certain that the juror did not know Babe Pennell. (Tr. p. 32).

## C. *Testimony of James Alvin Rhodes*

The next witness at the evidentiary hearing was James Alvin Rhodes who was the codefendant of the Defendant Cheek.

Rhodes testified that:

He is the same James Alvin Rhodes who was tried with Cheek in this Court in July of 1984. He further testified that between July 19 and July 25 during the trial he received a call from an associate named Babe Pennell, and that maybe two weeks prior that Pennell had called and told him that for his best interest "... he had to do something concerning this trial, and he had picked me ..." Pennell told Rhodes to meet him at his home on Sunday morning. (Tr. pp. 33, 34, 35, 36).

This was before the trial started and Pennell told me he was scared he was going to get convicted on drug charges behind all this. (Tr. p. 37).

Pennell took Rhodes to a home in Charlotte and this black lady was there whom Rhodes did not know, but it was Rhodes' understanding that the conversation between Pennell and the black lady was aimed at trying to do something to help Rhodes with his trial. They spent the whole afternoon doing it. Rhodes did not know at the time it was a juror. It could have been two weeks before the trial. Rhodes received another phone call from Pennell during the trial on Saturday night after 8:30 or 9:00 o'clock p.m.—somewhere between there. (The trial commenced on the previous Thursday). (Tr. p. 39).

Pennell told Rhodes to come to Statesville, North Carolina to meet with him as soon as he could. When Rhodes arrived at Statesville, Pennell and another gentleman were there. Pennell told Rhodes he needed to go as soon as possible, and not even to take his car, so Rhodes took another car. (Tr. p. 39). Pennell told Rhodes he had to go alone. (Tr. p. 40). When he arrived at the cab stand in Charlotte a black male was there and he grabbed Rhodes immediately and told him to go to the back room. Rhodes could not recall if it was Alexander. The black male said there was some money there. Rhodes went to the back room and Michael Davis, one of the jurors, a young black male, was there. Rhodes testified that this gentleman, if it was this gentleman, said "Do you know this man?" And Davis looked and said "Yes, I do. I'm in a trial with him." At that point Davis immediately got up and left. (Tr. pp. 41, 42).

Rhodes testified that during the trial in 1984 he never told Cheek about what happened in that incident. The first time Rhodes told Cheek was when they were incarcerated in Butner together in 1988. (Tr. p. 42).

Cheek did not indicate to Rhodes that he knew about the incident. At that time Rhodes testified he had a habeas petition pending and that he told Cheek he would be willing to sign an affidavit at some point but that he would not be willing to sign it until his § 2255 petition had been finally decided by all the courts. In 1990 or early 1991 Rhodes' habeas petition had been finally denied and Rhodes testified he would be willing to sign an affidavit at that time. (Tr. pp. 42, 43, 44).

## D. *Cross–Examination of Rhodes*

On cross-examination Rhodes testified he could have provided testimony that would have involved Pennell in the drug business, but that he did not have any knowledge about any drug dealings between Cheek and Pennell. (Tr. p. 45).

Rhodes testified on cross that the business he came to in Charlotte was a cab stand, and that he did not see anything that could be a bonding company. He further testified that some black male he had never met before was present when he got to the cab stand and grabbed Rhodes as soon as he saw him. (Tr. p. 46). The black male told Rhodes the person he needed to see was in the back room and that "the money is here." Rhodes testified he didn't think any amount was disclosed. Rhodes could not say for sure the man Attorney Rudolph asked him to look at in the courtroom (Alexander) was the man Rhodes met with. He could not say it was or was not. Rhodes testified that Babe Pennell did not tell Rhodes he was working with a juror. (Tr. p. 47).

Rhodes testified that Babe Pennell did tell Rhodes he was in contact with someone who knew one of the jurors, but did not tell Rhodes who. (Tr. p. 48).

Rhodes testified that when he was housed at Butner with Cheek in early 1988 he told Cheek he met with one of the jurors during the trial and that it involved Babe Pennell. Rhodes further testified he could have told Cheek which juror it was but he did not remember. He did tell Cheek it was a young black male juror, and that Babe Pennell was involved. Rhodes further testified that he would be willing to sign an affidavit setting all this out once his petition had been decided and once the statute of limitations ran out in 1989. (Tr. p. 48).

Rhodes testified that other than the investigator for Cheek and Rudolph he has spoken with numerous people over the years, including his brothers, that he had met one of the jurors, he told his ex-wife that he met with a juror to try to bribe him. He told his brothers that before he started to serve his sentence. (Tr. pp. 49–50). Rhodes told quite a few people including people in Wilkes County, his home, his son, a few more guys like Wayne McNeil. Rhodes testified these were people that would know Cheek and his family. (Tr. pp. 50, 51).

He has never seen the juror since. (Tr. p. 53).

### E. *Re–Direct Examination of Rhodes*

On redirect examination Rhodes testified that during the weeks leading up to his trial it would be fair to say there was some word out on the street in Wilkes County that he might take a plea and cooperate.

Rhodes testified he was out on bond pending his appeal after his conviction, and he had these conversations with people like his brothers and those sorts of people while he was out on bond pending his appeal. Babe Pennell died in federal prison. (Tr. pp. 54, 55).

### F. *Direct Testimony of Michael Louis Davis—Defendant's Witness:*

Davis is the same Michael Louis Davis who served as a juror in this Court in July of 1984 and was sworn in as a juror on Thursday, July 19. After he was sworn in the attorneys for the Government and the Defendants made their opening statements and court was recessed until the next morning at 9:00 o'clock a.m. The jury was told not to discuss the case with anyone outside the courtroom and if anyone approached the jury that should be reported to the Court immediately. (Tr. pp. 56, 57, 58).

One evening while Davis was serving as a juror a Lincoln Continental or a station wagon automobile pulled up while Davis was talking to a neighbor adjacent to his apartment complex. Davis walked over and asked "Who is it?" The person in the car asked him "Is your name Michael Louis Davis?" Davis answered "Yes," and he said "I'm from the courthouse, and you're needed at the courthouse." (Tr. pp. 58, 59, 60).

Davis' apartment is one of many in a building, with one apartment being next to the next apartment, side by side. Davis was at the apartment next to his and the person drove up to Davis' front door and went up to Davis' front door. (Tr. p. 59).

When the man told Davis he was needed at the courthouse Davis said, "Well, they must have an emergency meeting or something." Davis then went into his apartment and got his jacket and went with him.

The man was a short black man with glasses and he was wearing a cap, brim type of hat. (Tr. pp. 60, 61). He was in his 40's or 50's with a balding head. Davis had never seen him before. He had not called Davis before he came. (Tr. pp. 61, 62).

Davis understood from the Court at the end of each day that he was to come back the next morning.

The person in the car did not show Davis any identification and Davis did not ask for any. When Davis was initially summoned to Court he received an official summons from the Court, not someone bringing him to Court in a Lincoln Continental. (Tr. p. 64).

The man in the Lincoln told Davis "they" needed him at the courthouse and that he had come to pick Davis up. Davis thought that was peculiar, but guessed they knew

what they were doing. It was about dusk somewhere about 7:00 and was cool. (Tr. pp. 65, 66).

Davis did not call the Court to check. He had been told by the Court not to have any contact about the case with anyone outside the court proceeding but assumed that this person was sent by the Court. Davis got in the car with the person who never told Davis his name. (Tr. pp. 69, 70). Davis was in the front seat to drive downtown. The person did not tell Davis how he was going to get back home that evening. Davis did not drive his car and testified that if Mr. Alexander testified that he did not drive Davis downtown that would definitely be a lie. (Tr. pp. 70, 71).

Davis does not remember the route Alexander took when driving him but ended up at the police station. Davis estimated the time to arrive at the police station to be about fifteen, twenty minutes. Davis did not say anything to the person he was sitting in the front seat with. Not a word passed between Davis and the person driving. Davis was getting suspicious when he ended up at the police station. (Tr. pp. 72–75).

Davis was thinking to himself "Why are we down here? We are supposed to be at the Federal Courthouse, if he is coming to get me for the Federal Courthouse."

Davis did *not* say anything to the driver and the driver did not say anything.

The driver then told Davis to get out of the car and follow him, so Davis went with him into the police station bond place. The driver told him to stay there and Davis stayed there while the driver left the room. (Tr. p. 76).

Davis stood there for about 15 minutes while the driver was gone. Davis knew something was up because he knew a person sent from the courthouse would have brought him to the courthouse. (Tr. p. 77). Davis never asked the person who drove anything. Davis knew something was wrong and he knew this person might not be on the level. (Tr. p. 79).

When the person came back to the bondsman's area at the police station, Davis does not remember asking him anything. Davis knows he asked the driver something because they didn't go to the Federal Courthouse. (Tr. p. 80).

Davis knew the driver was a bondsman, not a federal court official. Davis went with the driver of the car to the bail bond office on Brevard Street. The driver did not force Davis into the car. By this time he had been with the bondsman almost an hour. Davis walked in the door of the bondsman's office and sat there for about ten minutes. The driver did not force Davis to go into the office and there were no threats at all. Davis repeated more than once that he was not threatened. (Tr. pp. 81, 82, 83). Then the following transpired:

A. I sat there like a person just sat there for about ten minutes, and I asked him I said, "Are we going to the courthouse, Federal Courthouse?" He said, "Just wait, just wait." I said, "Wait? I mean, it's getting late." He said, "Just wait." And I started thinking I should get out of here because something is wrong. So I got up out of my seat. (Tr. p. 83, lines 17–22).

Q. Hold on a second. What did you think you were waiting for? (Tr. p. 83, lines 23–25).

A. I have no idea. I asked what we were waiting for. He said, "Just wait, just wait." I said, "For what?" I said, "We're supposed to be going to the courthouse. We're supposed to be there. Why are we here?" He asked me just wait, and that is when I say, "I better get out of here," so I walked home.

(Tr. pp. 83, 84).

The bail bondsman's office had a front and back room. The Defendant's attorney suggested to Davis that he was in the back office. Davis testified he was in the front office and that he did not ever go into the back office. (Tr. p. 85).

The transcript (lines 11–22, p. 85) is as follows:

Q. Sir, in this particular bail bonding office, there is a front office and a rear office, correct?

A. I don't know.

Q. Sir, you were sitting in the back office.

A. I was sitting in the front.

Q. Did you ever go back in the back office?

A. Sure did not.

Q. If two witnesses testified under oath here independently of each other that you went back into the rear office and was sitting in the rear office, both of those witnesses are lying?

A. Definitely a lie.

Davis' testimony on page 86, lines 5–25 and page 87, lines 1–24 was as follows:

Q. While you were at the bail bonding office Mickey Rhodes, one of the defendants on trial in federal court in the case you were a juror on, came walking in, correct?

A. Yes. After I had told this person that I had to go. He told me to wait. I said, "For what reason?" He said, "Just wait." I decided for myself something is not right here. So as I got up out of my seat, the door opened, the front door opened, and I noticed that the person who was on trial— well, I seen him and he seen me. I didn't say nothing. I walked straight out the door and straight to my house. I had to walk all the way home.

Q. You claim you walked home?

A. I walked home.

Q. Well, why did you walk home?

A. Why did I walk home?

Q. Yes, sir.

A. Because this person very deviously lied to me about being an official from this courthouse to get me out; he lied.

Q. Let me ask you this: If you thought you were there in connection with the same court business, why was it such a surprise to you when the defendant walked in? After all, a defendant would have to be present for court business, wouldn't he?

A. I was supposed to see this defendant in court, not in somebody's place of business.

Q. Late at night?

A. Like you said, late at night.

Q. Now, let me ask you this: Why didn't you just say to the bail bondsman, "Sir, I would like you to take me home now"?

A. Well, after this incident happened and this person walked through the door and I walked out, I dropped him and everything back there. I didn't want nothing to do with that, a person being dishonest to— just for some reason to use me, which I was used.

Q. What did he say to you that you concluded to have been dishonest?

A. That he was from this Federal Courthouse. He is from the courthouse.

Q. You knew that was dishonest when you were back at the police station.

A. Like I said, I presumed him to be working for this courthouse, and I have no idea how this proceeding or legal stuff was handled. I don't know who was working for who.

Davis felt like he had been set up or used. Davis testified he had no idea who was trying to set him up. (Tr. p. 89).

The transcript (p. 88, line 17 through p. 95) may better set the scene for Davis' testimony concerning being set up:

Q. There was no doubt in your mind when you left that bail bonding office that night that what had happened there was improper, correct?

A. Yes.

Q. And didn't you tell the agents that you felt like you had been set up?

A. Yes. That's another word for being used.

Q. Why did you feel you had been used or set up?

A. Because he lied. He wasn't honest on his purpose for being there.

Q. Who did you feel had set you up or used you?

A. Set up is an interpretation of the word "used."

Q. Didn't you tell the agents that as soon as you saw Mr. Rhodes walk into the office, you felt that someone was trying to, quote, "set me up"?

A. Yeah.

Q. And my question was who did you think was trying to set you up?

A. Someone.

Q. Mr. Rhodes perhaps?

A. I have no idea. I seen his face in there. It had to be him. Who would deliberately lure me to that place with the intentions of doing something?

Q. Certainly he would have been involved in this setup of some sort, right, in your mind?

A. Well, he was there.

Q. Did you have any idea what they were trying to set you up for?

A. I have no idea. I know I was on this jury. They took advantage of that.

Q. Sir, at any time, either before you got on that jury or while you were serving on the jury, did anyone—listen to the question carefully—at any time ever mention to you, either directly or indirectly, paying you some money to influence your vote on that jury?

A. No.

Q. Did you not tell people while this was happening that someone had attempted to bribe you?

A. No.

Q. Did this incident shake you up a little bit?

A. Devastated me at that young age. I was devastated. I was concerned.

Q. You were very upset.

A. Concerned.

Q. Now, given the fact that you were devastated, as you put it because of your age, did you come back to court the next day whenever the court came back into session?

A. I don't remember.

Q. Do you remember if there was court the next day or whether there were a few days? Do you remember whether—I take it you got back home pretty late after this walk from Brevard Street all the way up to where you lived?

A. Well, I walked to my parents' house. That is in the same route to my house. I needed a ride from my father's and stuff like that.

Q. Did you tell your parents what happened?

A. Nope. They get very upset and very out of proportioned [sic].

Q. Well, do you remember whether you had court that very next morning? Whether you had to sort of get up the next morning and get to court or whether it was a weekend day?

A. I really don't remember.

Q. In any event, you went back at some point when this trial continued, right?

A. Yes, I think so, yes.

Q. And when you came to court the next morning after that incident, whenever that might have been whether it was the next morning or two mornings after that or whether it was over the weekend—whenever you came back to court next, did you tell anyone, a marshal, a clerk, the Court, or anyone what had happened?

A. No, I did not. For one thing, I was very afraid, and I didn't know what consequence it would have on that case, I had no idea, and to me since nothing happened.

Q. Well, you say you were very afraid, what were you afraid of?

A. Oh, well, some type of retaliation or something dealing with that type of case.

Q. When you say "retaliation," you mean by Mr. Rhodes or someone associated with Mr. Rhodes if you came forward and said this?

A. Well, that case, just that case.

Q. So either retaliation by someone associated with the defendants, or—

A. The defendants.

Q. I'm sorry?

A. Yes, the defendants.

Q. So one of the things you were concerned about after this was retaliation by the defendants if you came forward and said something?

A. Yes. I gave that some thought, yes.

Q. And I think you also said you weren't sure what effect it would have on the case.

A. Yes.

Q. Well, you had been sitting with Judge Potter as a juror for at least a day at this point.

A. I don't remember.

Q. Well, in any event, it would have been a fair assumption on your part that Judge Potter probably would have been able to figure out what effect it would have on the case and how to deal with that best, don't you think?

A. Sure.

Q. But you didn't bother to mention it to him?

A. True. Like I said, I was afraid and I didn't have no idea. It's not my place, as you said, to assume such—

Q. You knew there were people called alternate jurors, right? You remember there were some alternate jurors sworn?

A. I don't remember. I'm pretty sure there was.

Q. Did you think to yourself, "Gee, maybe I ought to talk to Judge Potter in private, confidentially, about what happened"?

A. Yes, like I said, but I was going on the fact that there might be some type of retaliation of me of like telling what happened, and like I said, a case like that I just took that for an example, you know.

Q. Did you also have some concerns that someone might misinterpret what you did and think perhaps you had done something wrong?

A. Really, I didn't give it no thought because after the time that happened, I just forgot all about it.

Q. At the time it happened when you were trying to decide whether to tell anybody about it, was one of the things that was sort of floating around in the back of your mind a concern that someone might think that you had done something improper?

A. I don't know. I might have thought that. I don't know. I don't remember.

Q. Now, sir, during this period of time, you were in the National Guard, were you not?

A. Yes.

Q. And after this incident and before the trial was over, you had National Guard duty?

A. Before the trial was over?

Q. Yes, sir. Let me show you. Do you have your statement up there, the one you gave to the agents? Didn't you tell the agents after the incident with Rhodes happened, but before the trial had concluded, "Davis attended a weekend drill with his National Guard unit in Charlotte"? Right?

A. Yes.

Q. Indeed, you drilled back then, I think it was usually the third weekend of the month; isn't that right?

A. I don't remember. I'm not quite sure.

Q. In any event, you did have guard duty, and you did speak to your commanding officer, Captain Harding, correct?

A. Yes.

Q. And you told him, at least in general terms, about what happened, right?

A. Yes, not to mention any names. Just giving him examples of such and such, if so and so do this, and so and so do that. Nothing that would jeopardize the trial, nothing like that.

Q. Of course, you had already been told by Judge Potter several times not to discuss any matters concerning the case—

A. I remember that.

Q. —with anyone outside of court.

A. True.

Q. So technically at least when you were sitting there discussing it with Captain Harding, you were sort of violating what the judge—

A. No, I didn't call no names.

Q. Well, let me ask you this: You asked his advise [sic] about what you should do in this situation, right?

A. Yes. I just said something happened that involved me, and there may come a time you may have to speak on my behalf, my character and integrity. Just in case they ask questions concerning me or whatever, like that.

Q. Tell me what was going on in your mind about that. What were you concerned about?

A. Well, I just asked him, just in case.

Q. In case of what?

A. I just asked him, just in case. He was giving me advice, and I wanted to get his assurance that he would speak up for me.

Q. In other words, if someone accused you of doing anything improper that there would be a character witness who could speak on your behalf, right?

A. Yes.

### G. *Cross–Examination of Davis*

On cross-examination, Davis testified he was born August 2, 1957, that he graduated from high school and had a year and a half at Central Piedmont College. He works for Transit Freight delivering furniture and before that he was a warehouseman for Duke Power Company for 15 years.

Alexander who was in the courtroom was asked to stand and Davis testified that he thought he was the one who had picked him up. (Tr. p. 97).

Davis further testified on cross-examination when he got up to leave the bondsman's office he saw Rhodes come in but did not speak to him at all. A woman came in the front door and Davis did not know where she went, but she was not sitting in the front room with Davis. The time Davis got up out of his seat to leave the door opened and there Rhodes was. "And I just got up, looked at them, straight out the door. Didn't say a word, didn't say anything, just kept walking." (Tr. p. 99, lines 3–5).

Davis does not know Babe Pennell and has never heard of him. Davis never saw any money while he was in the bond office and nobody offered him any money. Nobody talked to Davis about influencing the jury or his personal verdict. Davis did *not* relate what had happened to *any* of the other jurors on the case (emphasis added). (Tr. p. 99).

The following questions were asked and answered as follows:

Q. And did you listen to all of the evidence that was put forth by both sides and consider it in reaching your own personal verdict?

A. Yes, sir.

**MR. RUDOLF:** Objection, Your Honor. (Tr. p. 99, lines 21–25).

**THE COURT:** He can ask that question whether or note he considered the evidence. Overruled.

BY MR. BELL:

Q. Did you consider all the evidence?

A. Yes.

Q. Were you persuaded?

**MR. RUDOLF:** Objection.

**THE COURT:** Sustained. (Tr. p. 100, lines 1–8).

Davis further testified that he did not relate the circumstances of that night's events to any other juror. (Tr. p. 102).

### H. *Direct Testimony of Ronald Napoleon Harding*

This witness is a member of the National Guard and holds the rank of Major.

In July of 1984 he was a captain in the National Guard. At that time his unit drilled on the third full weekend of each month. At that time he had a young man under his command by the name of Michael Davis. The third full weekend of July 1984 would have been the 21st or 22nd and because of the systematic scheduling that would have been the weekend that his unit would have drilled.

That weekend Michael Davis came to Harding and told Harding that he was sitting on a jury and that he had been approached with a bribe. (Tr. p. 107). Davis was very concerned by it. (Tr. p. 107). Davis was taking it seriously and was afraid of some of the things that could possibly happen to him in that time. (Tr. p. 108). Davis wanted to know what should he do. Davis was concerned about his safety and well being and about his integrity. Davis was afraid that if he came forward people were going to think that maybe he had done something to cause him to be selected and be identified that way. (Tr. p. 108). That maybe he had done something to make somebody think he would take a bribe. Harding did ask Davis if he was also concerned that he would be endangering his health or someone in his family if he

came forward. Harding cannot recall if Davis indicated if he came forward he would be endangering his health or someone in his family, but Harding did ask about that. (Tr. p. 109).

Harding testified that Davis didn't know what to do about how to bring it forward or if to bring it forward. Harding also testified that there was never any mention on his part that he was considering taking any bribe and that Davis' concern was to do his civic duty, to do his job and try to put himself in a position to try to do it fairly. (Tr. p. 109).

Davis' concern about what to do was whether to actually go forward and tell somebody about it. (Tr. p. 110). Harding testified that under the circumstances not really knowing whether there was a threat to Davis or whether Davis perceived a threat to him, Harding told Davis he would—to really take a look at it and do the right thing. Harding also offered assistance that if Davis wanted to find out or identify exactly who to approach to be able to tell, that Harding would assist him in that. Harding testified that after Davis left his office he did not indicate whether he had made a final decision about what he was going to do in terms of reporting this or note. (Tr. p. 110).

### I. Cross–Examination of Harding

On cross-examination, Harding testified he did not have any following conversations with Davis about this. (Tr. p. 111).

### II. CREDIBILITY OF WITNESSES

Before reaching the Conclusions of Law, the Court will discuss the testimony of Oren Alexander, the bondsman, and James Alvin Rhodes (Mickey Rhodes), Cheek's co-defendant, Michael Louis Davis, the juror, and Ronald Napoleon Harding, Davis' National Guard commanding officer.

Oren Alexander was, from the Court's perspective, a reluctant witness, and his testimony conflicted on key points with that of the juror, Michael Davis. He testified that he was asked by Babe Pennell and/or Dot Stewart to find a young black male who was a witness in a court case; that he found the young black male and told him "a friend of mine" wanted him to come to his bonding office that evening. Alexander testified the young black male then drove himself to Alexander's office arriving about 8:00 o'clock p.m. Davis testified he rode with Alexander. Then Alexander testified that the white male and black male were in the back room of his office and he and Stewart were in the front room, and later the black male came out and said the white male wanted him to do something with the jury, and that he, the black male was on the government's side, something like that. Davis testified he never left the front room, that he did not go to the back room at any time and that he never had any conversation with anyone about anything.

Alexander was obviously reluctant to testify about this matter and his testimony was replete with vague answers such as "I don't think they asked that question", "I may have", "I don't recall", "He might have", "According to this, I did tell him that, but I think the white male was there first", "I may have asked him", "If they got it wrote down there, I probably said it", etc.

On cross-examination, Alexander admitted he became aware a crime had been committed but he didn't tell law enforcement. His testimony on that point appears in the transcript on page 28, lines 16–25; page 29, lines 1–25; page 30, lines 1–17, as follows:

Q. So you say that you came to find out that somebody had used your office to try to bribe a juror?

A. Yes. I would say that.

Q. Did you know at that time whether the juror was involved in a state or federal case?

A. No.

Q. As a bondsman, you come into daily contact with law enforcement, don't you?

A. Yes, I do.

Q. Did you tell anybody in law enforcement that this had happened?

A. When?

Q. Within a week of it happening?

A. No.

Q. Within a year of it happening?

A. No.

Q. Except for when the agent seated next to me came and talked to you, did you tell any sworn law enforcement officer what had happened in your office that night?

A. No.

Q. Why was that?

A. Why?

Q. Yes, sir.

A. I had no reason, to my knowledge.

Q. Well, Mr. Alexander, from your testimony you say that you became aware that a crime had been committed in your presence and in your office. That is, the attempt to bribe a juror. Don't you think that you had some sort of at least moral responsibility to tell somebody about that?

A. No, I didn't think so. I didn't anyway.

Q. You were first contacted by the agent seated next to me on January 20, 1993. Do you recall that?

A. I remember them came in my office. Yes, sir.

Q. Do you recall telling them you didn't want to answer their questions without having your lawyer present?

A. Sure, that's true.

Q. And then there was a later interview in my office with your attorney, Arthur Goodman, and these two agents, correct? And at that time, you asked before you would submit to an interview whether or note you could be prosecuted for what you were about—

A. I think my attorney asked that. Do you recall?

Q. I do recall, but I'm not allowed to testify. What is your recollection.

A. I think the lawyer probably asked you.

Q. That was something you were concerned about knowing, whether you could be prosecuted for what happened in your office in your presence that night?

A. Yes, I did.

Q. And you didn't want to answer any questions about it as long as you thought you might be prosecuted?

A. That's true.

Rhodes' testimony was different than Alexander's in that he testified when he arrived at the cab stand in Charlotte a black male was there and grabbed him and told him to go to the back room that there was some money there. Rhodes said he could not identify Alexander in the courtroom as being the black male. When Rhodes came into the back room, Davis was there and Davis said he knew Rhodes, he was in a trial with him.

On the other hand, Davis testified that Alexander came to his apartment and said he was needed at the courthouse. Davis thought this was peculiar, but went with Alexander anyway, and after a stop at the police department and went to the "bond room" with Alexander and waited for him for about 15 minutes and then went to Alexander's office and sat in the front office, never went into the back office and never saw Rhodes, except as he was walking out of the front door. He never spoke to Rhodes.

Davis, without equivocation, testified that if two witnesses (Alexander and Rhodes) testified that Davis went into the rear office and was sitting in the rear office that would definitely be a lie.

The Court will take the juror's testimony and the testimony of Major Harding as true and not the testimony of Alexander or of Rhodes, where it conflicts with the testimony of the juror, Davis or Major Harding. The Court does not find Alexander or Rhodes to be credible witnesses.

### III. *FINDINGS OF FACT*

The Court makes the following Findings of Fact, based upon the testimony of the two credible witnesses, Davis and Harding, and of the witnesses Alexander and Rhodes where not in conflict with that of Davis or Harding:

1. Michael Louis Davis served as a juror in the trial of *United States v. Garvey Martin Cheek and James Alvin Rhodes* in July of 1984, at which both defendants were found guilty by a jury on all counts.

2. During the trial, one Oren Alexander, a bail bondsman, came to Davis' residence between 7:00 o'clock p.m. and 8:00 o'clock p.m. and told Davis he was from the court and that Davis was

needed at the courthouse. (Tr. p. 58, lines 14–19; p. 65, lines 18–19). Alexander had been asked by Babe Pennell or Dot Stewart to find a young black male involved in a court case. (Tr. p. 10, lines 18–25; p. 11, lines 1–25; p. 12, lines 1–3).

3. Alexander was driving a Lincoln Continental. (Tr. p. 59, lines 20–21).

4. Davis did not ask for any identification, nor did he call the courthouse. (Tr. p. 64, lines 10–11; p. 67, lines 21–22).

5. Davis got into the front seat of the car next to Alexander. (Tr. p. 70, lines 5–9).

6. It would definitely be a lie if Alexander testified he didn't drive Davis. (Tr. p. 71, lines 16–19).

7. They wound up at the police station where Alexander was bailing out somewhere [sic] and he told Davis to get out and wait. (Tr. p. 72, lines 15–18).

8. The trip took fifteen, twenty minutes. (Tr. p. 74, lines 14–17).

9. Not a word passed between Alexander and Davis during that time. (Tr. p. 74, lines 20–25; p. 75, lines 1–20).

10. Davis became suspicious when Alexander brought him to the police station but did not say anything to Alexander who told Davis to get out of the car and follow him. (Tr. p. 75, lines 24–25; p. 76, lines 1–18).

11. They were at the police station about 15 minutes. (Tr. p. 77, lines 6–7).

12. Davis and Alexander got back into the car and he went to this bondsman's place and Davis asked Alexander "What are we doing here?" (Tr. p. 80, lines 5–14).

13. Davis went into the bondsman's office and Davis had no idea why he was there. After about ten minutes he left and walked home. While he was waiting, Davis asked Alexander "Are we going to the courthouse, Federal Courthouse?" Alexander replied "Just wait, just wait." Davis started thinking something was wrong so he should get out, so he got out of his seat, (Tr. p. 83, lines 16–22) and walked home (Tr. p. 83, lines 16–25; p. 84, lines 1–5; p. 86, lines 16–17).

14. Davis was sitting in the front office and never went to the back office. (Tr. p. 85, lines 11–22).

15. As Davis got out of his seat to leave, the front door opened and Davis noticed Mickey Rhodes. Davis saw him and Rhodes saw Davis. Davis did not say anything and walked straight out the door and straight to his house. (Tr. p. 86, lines 5–15).

16. Davis felt as though someone was trying "to set him up", but he did not know who. Rhodes was there. (Tr. p. 88, lines 21–25; p. 89, lines 1–21).

17. No one, either before he got on the jury or while he was serving on the jury, at anytime ever mentioned to Davis either directly or indirectly paying him some money to influence his vote on the jury. (Tr. p. 89, lines 22–25; p. 90, lines 1–2).

18. Davis never told people while this was happening that someone attempted to bribe him. (Tr. p. 90, lines 3–5).

19. Davis was devastated, concerned about this. (Tr. p. 90, lines 6–8).

20. Davis was not forced to do anything and was not threatened at all. (Tr. p. 82, lines 21–25).

21. Davis was afraid, he didn't know the consequence it would have on the case, and to him since nothing happened. (Tr. p. 91, lines 7–15).

22. Davis was afraid of some type of retaliation by the defendants. (Tr. p. 91, lines 16–25; p. 92, lines 1–10).

23. Davis discussed with Major Harding, his commanding officer in the National Guard, what had happened in general terms.

24. Davis does not know Babe Pennell and has never heard of him. (Tr. p. 99, lines 6–9).

25. Davis never saw any money while he was in the bond office, no one offered him any money and no one talked to him about influencing the jury or

about his personal verdict. (Tr. p. 99, lines 10–17).

26. Davis did not relate what happened to any of the other jurors on the case. (Tr. p. 99, lines 18–20; p. 102, lines 11–13).

27. Davis listened to all the evidence that was put forth by both sides and considered it in reaching his own personal verdict. (Tr. p. 99, lines 21–25; p. 100, lines 1–5).

28. Davis was concerned about his safety, but he was more concerned about his integrity. (Tr. p. 108, lines 12–25; p. 109, lines 1–7).

29. Davis' concern was to do his civic duty, to do his job and try to put himself in a position to try and do it fairly. (Tr. p. 109, lines 14–25).

30. Rhodes told numerous people in 1984 or 1985 about his contact with the juror. (Tr. p. 49, lines 9–25; p. 50, lines 1–25; p. 51, lines 1–13).

31. The people that Rhodes told about the contact with the juror would know Martin Cheek and his family. (Tr. p. 51, lines 14–18).

32. At the time of the trial in 1984, Davis was 27 years old. (Tr. p. 96, lines 4–5).

33. Davis had graduated from high school and had attended Central Piedmont Community College for one and a half years. (Tr. p. 96, lines 6–7).

34. Davis had been employed at Duke Power Company for fifteen years as a warehouseman, forklift driver. (Tr. p. 96, lines 17–22).

35. Davis is now employed by Transit Freight delivering furniture. (Tr. p. 96, lines 11–16).

36. Davis is now 37 years old. (Tr. p. 96, lines 1–2).

## IV. CONCLUSIONS OF LAW

### A. Contact with Juror During Trial

*Remmer v. U.S.*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) is the leading case on the question of burden of proof as to the effect of an extraneous communication upon the deliberative process of the jury in which there is an extraneous contact with a juror, during the trial.

*Remmer* involved the fact situation that after the jury returned its verdict, the petitioner learned for the first time that during the trial a person unnamed had communicated with a certain juror, who afterwards became the jury foreman, and remarked to him that he could profit by bringing in a verdict favorable to the petitioner. The juror reported the incident to the judge who informed the prosecuting attorneys and advised with them. The judge did not inform the defense attorney.

The F.B.I. was requested to investigate. The F.B.I. report was considered by the judge and the prosecutors alone and they concluded that the statement was made to the juror in jest and nothing further was done or said about the matter. The petitioner did not learn about the incident until he read it in the newspaper after the verdict.

The defendant moved for a new trial and requested a hearing contending that he was substantially prejudiced. The District Court, without holding the requested hearing, denied the motion for a new trial. The Court of Appeals held that the District Court had not abused its discretion since the petitioner had shown no prejudice to him. The case went to the Supreme Court on a writ of certiorari.

The Supreme Court held:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox v. United States*, 146 U.S. 140, 148–150 [13 S.Ct. 50, 52–53, 36

L.Ed. 917;] *Wheaton v. United States,* 133 F.2d 522, 527.

We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless. The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

We therefore vacate the judgment of the Court of Appeals and remand the case to the District Court with directions to hold a hearing to determine whether the incident complained of was harmful to petitioner, and if after hearing it is found to have been harmful, to grant a new trial. 227 U.S. 229, 230 [33 S.Ct. 242, 242, 57 L.Ed. 490.]

*Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) was a New York State case in which the defendant was convicted of murder. During the trial a juror submitted an application to the District Attorney's Office for employment as an investigator. The application did not mention he was serving as a juror in defendant's trial. The prosecuting attorneys were made aware of the application before the trial ended but withheld the information from the defense counsel and the Court. The defendant moved that his conviction be vacated.

At a hearing before the trial judge, (Justice Birns) the prosecuting attorney explained their decision not to disclose the application and the juror explained he had seen nothing improper in submitting the application during trial. The trial judge found that the letter was an indiscretion but that it in no way reflected a premature conclusion as to the defendant's guilt or prejudice against him or inability to consider the guilt or innocence of the defendant. The defendant's motion was denied by the trial court, and that decision was affirmed by the Appellate Division of the New York Supreme Court. The defendant then sought habeas corpus relief in Federal District Court alleging he had been denied due process of law under the Fourteenth Amendment.

The District Court granted relief and that decision was affirmed by the Court of Appeals. The Supreme Court reversed, stating:

> This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. (Citing *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954)). In other words, the court ordered precisely the remedy accorded by Justice Birns in this case.

*Id.* 455 U.S. at 215, 216, 102 S.Ct. at 945, 945.

In *U.S. v. Angiulo,* 897 F.2d 1169 (1st Cir.1990) the defendants contended their constitutional right to an impartial jury was violated on the grounds of bias and misconduct arising from three distinct incidents during the trial.

The first incident involved a juror who requested to be excused because of his girlfriend's extreme fear that his service on the jury would lead to retribution by the Mafia. The juror had told three other jurors of his girlfriend's fears. The Court excused the juror and then questioned the three jurors with whom the juror had spoken, and on their assurance that the girlfriend's fears would have no affect on their ability to remain impartial retained them on the jury.

The second incident occurred during closing arguments when a juror informed the court that a bribe offer from third parties for a vote of not guilty had been relayed to her. She told the Court she had rejected the offer and had not told the other jurors about the bribe attempt. The Court excused her and informed the other jurors she had been excused for personal reasons. That was reported in the press immediately, and questioning by the Court revealed that four ju-

rors had been exposed to the press coverage. One juror who had seen the headline told another juror. A third juror reported seeing the headline. Finally, a fourth juror had overheard two people talking about the case and the fact that somebody had talked to a juror. On questioning, all four jurors reported to the Court that they would be able to render a verdict based only on the evidence at trial.

The third incident occurred at the outset of the deliberations when a juror handed a marshal a newspaper article he had seen another juror pull from an exhibit box and which he had taken from the other juror because he knew it was not supposed to be there. On questioning the two jurors it was learned that a third juror may have seen the article, which he had. All three jurors assured the Court that what they had seen would not prevent them from rendering an impartial verdict based on the evidence. Over the defendants' objections all of those jurors were retained.

On appeal the *Angiulo* Court held in regard to the girlfriend's fears first that contact was initiated by an intimate relation, rather than a third party stranger. Second, the contact was limited solely to the girlfriend and her boyfriend juror and the other affected jurors only learned indirectly of the situation through the boyfriend and third the contact involved only subjective expressions of fear rather than the traditional threat, bribe, or statement containing prejudicial substantive information.

The Court then stated:

... These facts raise a real question as to whether this incident is properly governed by the standards that apply to true *ex parte* contacts. Because the resolution of defendants' allegation does not turn on the answer to this question, however, we will *assume without deciding* that the standards governing *ex parte* contacts do apply and that, under *Remmer,* the girlfriend's conduct raised a presumption of prejudice that shifted the burden to the government to show that the contact was harmless.

*Id.* at 1184–85 (emphasis added).

*Angiulo* then related that many circuit opinions, including the Fourth Circuit, have resoundingly rejected the theory that the Supreme Court in *Smith v. Phillips* abandoned *Remmer.* Then the *Angiulo* court continued:

Because the government has made an adequate showing to overcome any presumption of prejudice, however, we have no occasion to decide today whether the girlfriend's conduct triggers a Remmer type presumption.

*Angiulo* did not decide that *Remmer* applied in that case.

In *Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532 (4th Cir.1986) a juror who was not selected at *voir dire* (a non-juror) mistakenly was allowed to join the jury during the first day's testimony and was with the jury during morning and afternoon breaks. The error was discovered at the end of the first day and the non-juror was dismissed.

During the first break the non-juror, after one hour of testimony, remarked to the entire jury, all of whom appeared to be listening, that he had worked around truckers and knew that what the plaintiff was testifying to was true, that trucking companies really do treat truckers badly and that no matter what the company said he would be against the company. One female juror replied that she was glad this gentleman was on the jury as he would be a great help.

The case involved a civil suit by a trucking company for breach of contract. On defendant's motion for new trial the trial court concluded that the juror's remarks were harmless and allowed the verdict to stand.

On appeal, the Fourth Circuit held that at a minimum the non-juror's remarks give rise to the reasonable possibility of resultant jury prejudice, and reversed and remanded for a new trial.

In *Stockton v. Virginia,* 852 F.2d 740 (4 Cir.1988), a state case, before the Fourth Circuit on a petition pursuant to 28 U.S.C. § 2254, several members of the jury were at lunch at the Owl Diner on the day they were deliberating on the sentence which the petitioner was seeking to have overturned, the proprietor of the diner approached the jurors and told them among other things that "they

ought to fry the son of a bitch." The jury recommended the death sentence.

There was other evidence that this trial receiving much publicity the jurors were approached at other times by interested citizens and were exposed to prejudicial suggestions.

The Fourth Circuit agreed with the trial court that the remark by the proprietor of the diner posed a potential for prejudice too serious to be ignored and ordered a reduction of sentence or a new sentencing hearing.

*Stockton,* at 743 summed up the law, at least in the Fourth Circuit, as follows:

> The Commonwealth argues that the defendant bears the burden of establishing that unauthorized third party communications with members of the jury resulted in actual juror partiality. It is true that the defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict. Once such a contact has been established, however, the government bears the burden of demonstrating the absence of prejudice.

> The Sixth Amendment guarantees a criminal defendant the right to trial by an impartial jury. No right touches more the heart of fairness in a trial. The fact that there was here no threat or inducement, no invasion of the sanctity of jury room deliberations, does not still the sense that something went awry. The Supreme Court has long recognized the dangers to impartiality posed by unauthorized communications between third parties and members of the jury. Almost a century ago the Court declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Court reinforced the rule set forth in Mattox:

> "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial ... The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."
> *Id.* at 229, 74 S.Ct. at 451.

The Fourth Circuit in *Stockton* further clarified the law in this Circuit at page 744:

> In *Phillips,* the Court declined to impute bias to a juror who, during the course of trial, applied for employment as an investigator with the district attorney's office. The Court again noted that the beliefs, biases, and preferences of every juror may be explored and exposed by the defendant at voir dire. Further, when some external manifestation of a juror's predisposition subsequently calls the juror's impartiality into question, the defendant is afforded the opportunity to establish the juror's actual bias. *Id.* 455 U.S. at 215–17, 102 S.Ct. at 945–46. *Where, however, the danger is not one of juror impairment or predisposition, but rather the effect of an extraneous communication upon the deliberative process of the jury, the defendant's right to an impartial jury requires that the government bear the burden of establishing the nonprejudicial character of the contact.* See, e.g., *Haley,* 802 F.2d at 1535–36 and n. 5 (civil case); *United States v. Butler,* 822 F.2d 1191, 1195–96 and n. 2 (D.C.Cir.1987); *United States v. Littlefield,* 752 F.2d 1429, 1431–32 (9th Cir.1985). *But see United States v. Pennell,* 737 F.2d 521, 532 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). (Emphasis added).

■ Thus, if the petitioner shows there was a contact of the juror and that such contact was of a character as to reasonably draw into question the integrity of the verdict, the burden of proof to show nonprejudicial character of contact with a juror during a criminal trial lies with the Government. However, as is noted in the conclusion, the

contact in this case did not cast a doubt on the validity of the jury's verdict.

## B. Juror's Predisposition Prior to Commencement of Trial

*United States v. Malloy*, 758 F.2d 979 (4th Cir.1985) stands for the proposition that the burden of proof to show actual bias by a jury lay with the defendant and that the remedy for juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. *Malloy* involved a motion under 28 U.S.C. § 2255 by a defendant who was tried by a jury which included a juror who had sat on another jury which had convicted Malloy's co-defendant of the same charges. Malloy contended that he was denied his right to a fair and impartial jury because he was convicted by a jury that was tainted by previous knowledge of the case and by a juror, Gossman, who had earlier voted to convict his co-defendant.

In *Malloy*, the Fourth Circuit cited *Smith v. Phillips* and stated:

> The Supreme Court rejected this argument and held that "the remedy for juror partiality is a hearing in which the *defendant* has the opportunity to prove actual bias." *Id.* at 215, 102 S.Ct. at 945. (Emphasis added). As the Supreme Court explained:
>
>> "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ... held in this case. *Id.* at 217, 102 S.Ct. at 946."

The lesson of *Smith v. Phillips* and its progeny is that the participation of a juror whose impartiality is suspect for reasons not known to defense counsel at the time of *voir dire* does not *per se* require a new trial. Instead, the verdict may be set aside if a post-trial hearing demonstrates that the juror was actually biased. Here, the district court held the required hearing, but neither the government nor Malloy produced any evidence concerning Gossman's supposed bias. It was stipulated that Gossman was incapable of testifying as to her state of mind at the time of trial.

■ As was held by the court in *Remmer*, the presumption is not conclusive and the trial court's duty is to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after hearing it is found to have been harmful, to grant a new trial. In other words, the court should determine whether the extra-judicial contact was of such a nature as to reasonably cast a doubt as to the jury's verdict.

Because of the restrictions of Federal Rules of Evidence 606(b) it is unlikely that a trial court can determine with any exactness the impact an improper contact has had on the jury.

■ However, it should be kept in mind that the improper contact in Cheek was limited to one juror and that the one juror never mentioned the contact to the other jurors. This Court can only consider all of the evidence objectively in the light of the common experience and exercise its discretion which is narrowed in these circumstances.

In reviewing the findings of fact it is apparent that Davis is a person who is, to say the least, not a person who employs more words than are necessary, or an inquisitive person. He is a good, honest, hardworking citizen who wanted to do his civic duty and do it fairly in the words of the commanding officer of his National Guard Unit. (Tr. p. 109, lines 17–25).

Davis is the type of person who put his trust in those such as Alexander and Rhodes who would destroy our system by bribery

and dishonesty in order to further their own ends.

Davis was the only juror who had an extra-judicial contact by those persons whom this Court regards with profound contempt.

However, they have not achieved their purpose to cast a doubt on the jury's verdict in this case.

This Court has found as a fact based on credible evidence that no communication of an attempted bribe was made to Davis. The petitioner's counsel attempted to have the incident characterized as a bribe offer. (Tr. p. 109, lines 23–25).

Davis never told any of the other jurors about the incident. Davis never spoke to Rhodes, nor Rhodes to him. Davis never saw any money. No money was ever offered to Davis. Davis was not threatened. Davis did not know any of the parties who instigated or made the extra-judicial contact with him. The contact caused Davis to make a subjective expression of devastation in that he took it as a blemish on his integrity. There was not the traditional threat, bribe, or statement containing prejudicial substantive information made to Davis.

Finally, and perhaps most importantly, Davis, even though devastated by the incident, listened to all the evidence with his fellow jurors, and testified that he considered all the evidence in reaching his own personal verdict and joined with the other eleven jurors in reaching a verdict of guilty as to the two defendants, Cheek and Rhodes.

The burden of proof to establish that the contact of the juror was not prejudicial to the defendant may well be on the Government if the contact casts a doubt on the validity of the verdict. Conceding, without deciding, that the burden of proof is on the Government, the evidence demonstrates that the contact in this case was harmless in the sense that the contact was of a nature that it did not cast a doubt as to the validity of the jury's verdict. It is the petitioner's burden to establish that the contact with the juror on these facts reasonably cast doubt on the validity of the juror's verdict. *Stockton* at 747. This Court finds that Cheek has not met that burden.

None of the cases cited by the petitioner in support of his motion involve the same fact situation in this case. In this case, there were no words concerning a bribe which passed between the juror and the parties making contact, there was no offer of a bribe by the parties to the juror, the other eleven jurors were never aware of the incident; there is no evidence whatsoever that Davis ever said anything to the other jurors about the incident.

## V. CONCLUSION

■ In summary, if there is any contact or tampering directly or indirectly with a juror during the trial *about the matter pending before the jury,* that contact is deemed presumptively prejudicial, if not made in pursuance of known rules of court with full knowledge of the parties (emphasis added).

In *Remmer,* an unnamed person communicated to a juror that he could profit by bringing in a verdict favorable to the petitioner. In Cheek there was no communication with the juror. There were no words spoken to Davis the juror. In Cheek there was no contact or tampering directly or indirectly with Davis during the trial about the matter pending before the jury.

In *Remmer,* there was an investigation by the F.B.I. No hearing was held.

In Cheek a hearing has been held with all parties present and there was no F.B.I. investigation during the trial.

Thus, since no communication was made to juror Davis about the matter pending before the jury, or about any matter, *Remmer* does not prescribe a presumption of prejudice. Even if there were a presumption of prejudice it is not conclusive and the evidence at the hearing demonstrates that the juror listened to all the evidence and considered it in reaching his own personal verdict, and the Court finds that the evidence overcomes any presumption of prejudice.

The Court was reluctant to allow the parties to ask any questions of the juror Davis which might in any way violate the provisions of Federal Rule of Evidence 606(b). Obviously this makes it difficult to get at the

heart of what affect, if any, the contact with the juror had on the juror Davis' mind or emotions which may have influenced his verdict. However, based on all the evidence, the Court finds that the contact did not cast any doubt on the validity of the jury's verdict.

This Court has no evidence that the attempted contact by Rhodes with juror Davis was known to Cheek before 1988. However, the Court does find that it is remarkable that Rhodes had told numerous people including his brother and quite a few people in Wilkes County, (Cheek and Rhodes were residents of Wilkes County), his sons, and "a few more guys like Wayne McNeil" and that these were people who would know Cheek and his family. Yet, Cheek has proffered by affidavit that he did not know about the contact until 1988 or 1989. Cheek did not testify at the hearing and was therefore not subject to cross-examination.

In any event, it is now some 15 years after the event occurred and ten years since the trial.

In closing remarks, counsel for the petitioner argued that "there is clear evidence that this incident had a very marked impact on the young man." (Tr. p. 113, lines 6–10). Petitioner's counsel further argued that this incident created a presumption of prejudice because he is going to have it on his mind during the trial.

Davis testified under oath that he considered all the evidence in arriving at his personal verdict. As his commanding officer testified: "His concern was to do his civic duty, and to do his job and to put himself in a position to do it fairly."

The Court finds he has done that.

The verdict of conviction was affirmed by the Fourth Circuit (*U.S. v. Rhodes*, 779 F.2d 1019) in 1985. The Fourth Circuit (Widener, Circuit Judge) held as to the CCE conviction of Cheek:

Thus, as to Cheek, the evidence was clearly sufficient to support his CCE conviction.

*Id.* at 1026.

The Fourth Circuit denied a petition for rehearing. A petition to the Supreme Court for writ of certiorari to the Fourth Circuit was denied in April 1986. The evidence has been reviewed by the Fourth Circuit and presumably the Supreme Court almost nine years ago.

The jury in this matter (including juror Davis) heard the evidence and reached a verdict of guilty. The Fourth Circuit reviewed the evidence and the assigned errors and affirmed. The Fourth Circuit denied a petition for rehearing and the Supreme Court denied a writ of certiorari to the Fourth Circuit.

It would seem that at some point this judicial proceeding must draw to a close.

**IT IS, THEREFORE, ORDERED:**

1. The Order of the Magistrate Judge denying the Government's Motion to Withdraw its Response and Supplemental Response, and Stipulation that Petitioner is entitled to a new trial is **REVERSED.**

2. The Government's Motion to Withdraw its Response and Supplemental Response, and Stipulation that Petitioner is entitled to a new trial is **ALLOWED.**

3. The Petitioner's Motion for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 seeking an order that the conviction of Defendant in July of 1984 be vacated and a new trial ordered is **DENIED.**

The Clerk is directed to certify copies of this Order to defense counsel and the United States Attorney.