UNITED STATES of America, Plaintiff–Appellee,

v.

**Garvey Martin CHEEK, Defendant–Appellant.**

No. 95–6297.

United States Court of Appeals, Fourth Circuit.

Argued April 1, 1996.

Decided Aug. 26, 1996.

---

**ARGUED:** Thomas Kieran Maher, Rudolf & Maher, P.A., Chapel Hill, North Carolina, for Appellant. Kenneth Davis Bell, Acting United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** David S. Rudolf, Rudolf & Maher, P.A., Chapel Hill, North Carolina, for Appellant.

Before HALL and MOTZ, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Reversed and remanded by published opinion. Senior Judge BUTZNER wrote the opinion, in which Judge HALL and Judge MOTZ joined.

## OPINION

BUTZNER, Senior Circuit Judge:

Garvey Martin Cheek appeals from the district court's denial of his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2255. The district court's opinion is reported as *Cheek v. United States,* 873 F.Supp. 970 (W.D.N.C.1995). In the petition, Cheek had sought a new trial, alleging that his codefendant, James Alvin Rhodes, had attempted to bribe a juror during Cheek's and Rhodes' joint trial. Because the contact was presumptively prejudicial, and the government failed to prove that there was no reasonable possibility that the improper extrajudicial contact affected the verdict, we reverse the district court's judgment and remand for a new trial.

I

After a joint trial that began on July 19, 1984, and ended on July 25, 1984, a jury convicted Cheek of conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848, for which the district court imposed a sentence of 75 years without parole. This court affirmed. *United States v. Rhodes,* 779 F.2d 1019 (4th Cir.1985).

In 1992, Cheek filed a petition for a writ of habeas corpus, alleging that during the trial and without Cheek's knowledge, Rhodes had contacted a juror, Michael Louis Davis, as part of a bribe attempt. In response to the petition, the government initially acknowledged that if the facts were as alleged, a bribe attempt had occurred and Cheek should be given a new trial. The government then filed a supplemental response stating:

Following its independent investigation, the United States stipulates that the facts as alleged in this Petition, that is, that codefendant Rhodes contacted a juror during the trial of this case in an attempt to bribe or intimidate that juror, and that Petitioner had no knowledge of or role in the attempt to bribe or intimidate the juror.

The government also said that Cheek was entitled to a new trial based on the authority he cited. The government later sought to withdraw its supplemental response, alleging that there was conflicting Fourth Circuit precedent regarding the proper allocation of the burden of proof in cases of juror tampering. In its motion to withdraw, the government specified once again that the "basic facts are not in dispute, although the details may not be agreed upon by the parties."

After a hearing, during which no evidence was presented, the magistrate judge denied the government's motion to withdraw its supplemental response. The government appealed the magistrate judge's ruling. The district court, which had also presided over Cheek's trial, then held an evidentiary hearing to address both the government's appeal from the magistrate judge's order and the merits of Cheek's § 2255 petition. The district court reversed the magistrate judge's order.

Ruling on the merits of Cheek's petition, the court held that Cheek was not entitled to a new trial because the presumption of prejudice mandated by *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (*Remmer I*), was not applicable. The district court determined alternatively that even if the presumption applied, the government had successfully rebutted it by demonstrating that the contact had had no effect on Davis' personal verdict. The district court accepted Cheek's affidavit that he did not obtain proof of Rhodes' contact until long after the trial. Consequently, delay played no part in the district court's denial of the habeas petition. *See* § 2255 Proceedings R. 9 (1996).

At the hearing before the district court, Davis testified that he had been a juror in Cheek's and Rhodes' joint trial. On one evening during the trial, at about 7 or 8 o'clock p.m., a stranger named Oren Alexander drove to Davis' apartment. Alexander told Davis that he was needed at the federal courthouse. Davis testified that he thought at the time that this request was "peculiar" but that he thought "they must have an emergency meeting or something." Davis did not ask Alexander any questions.

After Davis got into the car, Alexander drove him to the police station, which was 15–20 minutes from Davis' home and 10 or 11 blocks from the courthouse. At this point Davis testified that he started "getting suspicious" and felt that his driver "might not be on the level." However, he refrained from questioning Alexander, who told Davis to get out of the car and follow him into the station. Once inside, the pair walked into a room and Alexander told Davis to wait. Alexander left the room and Davis remained standing in the room for approximately 15 minutes. Davis did not speak to anyone during that time. However, he testified that he knew "something was up" because a person sent from the courthouse would have brought him directly there if that person was "honest and on the level." He also testified that he began to think that "something was going on" in connection with his status as a juror.

Davis testified that Alexander returned to the room and told him to get back into the car. Davis complied voluntarily. Alexander then drove Davis to a bail bondsman's office. Davis testified that at this point he realized that Alexander was a bail bondsman and that court proceedings were not going to be held in the bondsman's office. However, he testified that although he was "very suspicious," he did not know what was going to happen. He therefore followed Alexander into the office. After about 15 minutes, Davis told Alexander that he was leaving. Alexander told him to wait. Davis decided that he had to leave "because something [was] wrong." As he rose to leave, Rhodes walked into the room. Recognizing Rhodes as one of the defendants on trial, Davis left the bondman's office without saying a word. He then walked home—a distance of four to five miles.

Davis asserted that Alexander had "deviously" lied to him about being a court official. He also stated that he believed that he had been "used." When counsel asked him why he thought he had been "used" or "set up," he answered: "I know I was on this jury. They took advantage of that." When asked if he knew who was trying to set him up Davis replied: "I have no idea. I seen [Rhodes'] face in there. It had to be him.

Who would deliberately lure me to that place with the intentions of doing something?" He testified that the experience had "devastated" him.

Davis acknowledged that numerous times during the trial the court had told all the jurors to report any suspicious contacts immediately. But Davis did not tell the district court judge, the attorneys, other jurors, or anyone else associated with the trial about his experience. He testified that he did not report the incident because he was "very afraid" of retaliation by the defendants. The only person he spoke to was his commanding officer in the North Carolina National Guard, Captain (now Major) Harding, whom the district court credited. Major Harding testified that Davis said he was sitting on a jury and that he had been approached with a bribe.

## II

■ Cheek argues that the district court erred by overruling the magistrate's order that denied the government's motion to withdraw its supplemental response. After an independent investigation, the government acknowledged in its supplemental response that Cheek was entitled to a new trial. This issue need not detain us. The government's opinion concerning Cheek's right to a new trial was not binding on either the district court or this court, although it "is entitled to great weight." *Young v. United States,* 315 U.S. 257, 258, 62 S.Ct. 510, 511, 86 L.Ed. 832 (1942) (direct criminal appeal); *see also Every v. Blackburn,* 781 F.2d 1138, 1140–41 (5th Cir.1986) (habeas corpus).

## III

■ The standard of review of the district court's opinion involves three inquiries. We review historical facts for clear error. *See* Fed.R.Civ.P. 52(a). Questions of law are reviewed *de novo. See generally Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 2546, 101 L.Ed.2d 490 (1988). The final question is whether the improper contact or communication compromised the impartiality of the jury. Ordinarily, the grant of a new trial is committed to the sound discretion of the district court. *See* 11A Charles Alan Wright, Ar-

thur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2818, at 194 (1995). However, because the ultimate factual determination regarding the impartiality of the jury necessarily depends on legal conclusions, it is reviewed in light of all the evidence under a "somewhat narrowed," modified abuse of discretion standard giving the appellate court "more latitude to review the trial court's conclusion in this context than in other situations." *Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532, 1537–39 & nn. 11–12 (4th Cir.1986); *Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir.1984).

There is no issue concerning the district court's findings of historical fact. Rhodes and Alexander offered conflicting testimony regarding the details of the factual circumstances of the alleged bribe attempt and their respective culpability in the attempt. The court stated that it did not find Alexander or Rhodes to be credible witnesses. Neither Cheek nor the government appeals from the district court's findings of historical fact regarding the circumstances of the bribe attempt.

With reference to questions of law, which is the second part of the standard of review, pertinent law is found in Supreme Court decisions. In *Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), the Court stated: "Private communications, possibly prejudicial, between jurors and third persons, . . . are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Underscoring this principle, the Supreme Court held in *Remmer I* that

any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defen-

dant, that such contact with the juror was harmless to the defendant.

*Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451.

■ Since the Supreme Court's decision in *Remmer I,* this circuit has established a three-step process for analyzing allegations of extrajudicial juror contact. The party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were "more than innocuous interventions." *Haley,* 802 F.2d at 1537 n. 9. If this minimal standard is satisfied, the *Remmer I* presumption is triggered automatically. The burden then shifts to the prevailing party to prove that there exists no "reasonable possibility that the jury's verdict was influenced by an improper communication." *Stephens v. South Atlantic Canners, Inc.,* 848 F.2d 484, 488–89 (4th Cir.1988); *Haley,* 802 F.2d at 1537.

## IV

In its conclusion, the district court stated, "since no communication was made to juror Davis about the matter pending before the jury, or about any matter, *Remmer* does not prescribe a presumption of prejudice." *Cheek,* 873 F.Supp. at 990. To support its reasoning, the district court wrote:

> [N]o communication of an attempted bribe was made to Davis.... Davis never told any of the other jurors about the incident. Davis never spoke to Rhodes, nor Rhodes to him. Davis never saw any money. No money was ever offered to Davis. Davis was not threatened. Davis did not know any of the parties who instigated or made the extra-judicial contact with him. The contact caused Davis to make a subjective expression of devastation in that he took it as a blemish on his integrity. There was not the traditional threat, bribe, or statement containing prejudicial substantive information made to Davis.
>
> Finally, and perhaps most importantly, Davis, even though devastated by the incident, listened to all the evidence with his fellow jurors, and testified that he considered all the evidence in reaching his own personal verdict and joined with the other eleven jurors in reaching a verdict of guilty

as to the two defendants, Cheek and Rhodes.

*Cheek,* 873 F.Supp. at 990.

■ We cannot accept the district court's conclusion. If the party attacking the verdict introduces competent evidence of extrajudicial juror contacts, the court must analyze whether the contacts were "more than innocuous interventions that simply could not justify a presumption of prejudicial effect." *Haley,* 802 F.2d at 1537 n. 9. But if a contact or communication "cannot be characterized as innocuous [the court] must proceed from the presumption of prejudice." *Id.* Here, without a doubt, there was an extrajudicial contact. To determine whether this contact was innocuous or whether it triggered the presumption explained in *Remmer I* we must turn to the factors the Supreme Court deemed important. These factors are: (1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury. *See Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451. It is these factors that establish the law about the presumption of prejudice.

We believe that the district court construed *Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451, too narrowly and that by doing so it did not correctly apply the law pertaining to the presumption of prejudice and the burden of proof. The evidence discloses that Cheek proved every factor that triggers a presumption of prejudice. As the district court found, Alexander contacted Davis, the juror. He communicated with Davis, telling him what Davis later recognized was a lie. Alexander sought to have Davis believe that he had been sent to drive Davis to the courthouse. Because he was a juror in the trial of Rhodes and Cheek, Davis reasonably believed that his presence at the courthouse was necessary in a matter pending before the jury. When Alexander drove Davis to his office to meet with Rhodes, the subsequent appearance of Rhodes was a contact that, as Davis immediately recognized, was with a defendant on trial in a case in which he was serving as a juror. Rightly he perceived that

Rhodes and his confederates had attempted to bribe him.

The district court emphasized that Davis never spoke to Rhodes, nor Rhodes to him; that Davis never saw any money; that no money was offered to Davis; and that Davis was not threatened. Although these observations are relevant, they do not negate the presumption of prejudice.

In this respect the sequel to *Remmer I* is instructive. The Court remanded *Remmer I* for an evidentiary hearing. Again, the Supreme Court granted certiorari. The district court's record on remand, reviewed in *Remmer v. United States*, 350 U.S. 377, 379, 76 S.Ct. 425, 426–27, 100 L.Ed. 435 (1956) (*Remmer II*), disclosed that after the trial started a man suggested that the juror could make some easy money if he would make a deal with the defendant, Remmer. The juror reported this approach to the district court, which directed the FBI to investigate. After the trial, the juror stated that there was some question that he had been approached and that he had been under terrific pressure. Ultimately the district court held that the incident was harmless and had no effect on the juror's judgment, integrity, or state of mind. The district court found the juror to be a "forthright and honest man." *Remmer II*, 350 U.S. at 379, 76 S.Ct. at 426.

The Supreme Court reversed and granted Remmer a new trial. It said in part:

> We think this evidence, covering the total picture, reveals such a state of facts that neither [the juror] nor anyone else could say that he was not affected in his freedom of action as a juror. From [the juror's] testimony it is quite evident that he was a disturbed and troubled man from the date of the [extrajudicial] contact until after the trial.... He had been subjected to extraneous influences to which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made.

*Remmer II*, 350 U.S. at 381–82, 76 S.Ct. at 427–28.

In *Remmer II*, an FBI agent interviewed the juror during the trial. The Court recognized that this improperly placed a strain on the juror. *See Remmer I*, 347 U.S. at 229–30, 74 S.Ct. at 451–52. It did not rely on this interview, however, as a basis for its decision in *Remmer II*. There the Court emphasized that the extrajudicial contact disturbed and troubled the juror, and it refused to speculate about the effect of the agent's interview. *Remmer II*, 350 U.S. at 381, 76 S.Ct. at 427–28.

■ Apart from the interview by the FBI in *Remmer II*, the similarity between that case and *Cheek* is obvious. In neither case did a defendant speak to the juror. In neither case did the juror see any money, and the juror was not threatened. In neither case was the word "bribe" uttered, but the jurors in both cases recognized that the encounter was an attempt to bribe. In *Cheek*, Davis was devastated and afraid as a result of the communication by Alexander and the contact with Rhodes. In *Remmer II*, the juror was disturbed and troubled by the extrajudicial communication. In neither case was the presumption of prejudice dispelled.

■ The presumption is not conclusive, but "the burden rests heavily upon the Government to establish ... that such contact with the juror was harmless to the defendant." *Remmer I*, 347 U.S. at 229, 74 S.Ct. at 451. The Court supplemented this precept by admonishing that a court must examine the "entire picture," including the factual circumstances and the impact on the juror. *Remmer II*, 350 U.S. at 379, 76 S.Ct. at 426–27. To implement the heavy obligation of the party who seeks to rebut the presumption of prejudice, we have prescribed that the proof must establish that there is no reasonable possibility that the verdict was affected by the contact. *Stephens*, 848 F.2d at 488–89; *Haley*, 802 F.2d at 1537–38.

## V

In *Cheek*, the government offered no rebuttal evidence. Instead it argues that relief should be denied because Cheek filed the habeas petition eight years after the trial ended. We reject this argument. In agree-

ment with the district court, we note that there is no evidence that Cheek knew of the extrajudicial contact before 1988. He then proceeded in a diligent manner after he obtained a statement from Rhodes admitting the contact. *See* § 2255, R. 9.

The government also argues that the "clearly erroneous" standard is the proper test for review of the district court's finding that Alexander's and Rhodes' contact with Davis did not prejudice Cheek's right to a fair trial. Based on this standard, the government urges us to conclude that the district court properly dismissed Cheek's petition.

In support of its position, the government cites five cases, none of which deals with a third party's extrajudicial contact with a juror. These cases are *United States v. Hines,* 717 F.2d 1481 (4th Cir.1983) (FBI agent photographing people—but not jurors—leaving the courthouse); *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (juror's *ex parte* explanation to trial judge about a mistake in answering a question on voir dire); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (pretrial publicity and qualifications of a juror); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (qualifications of a juror); *Thompson v. Keohane,* —— U.S. ——, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (effect of presumption of correctness under 28 U.S.C. § 2254(d) in review of habeas petitions of state prisoners). None of these cases purports to modify the presumption of prejudice applicable to federal cases arising from "any private communication, contact, or tampering" with a juror, which is explained in *Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451, and applied in *Remmer II,* 350 U.S. at 379–82, 76 S.Ct. at 426–28. None of these cases relieves the government of the "heavy burden" of proving that the improper contact was harmless. Both the government and the district court have misapplied the law explained in both *Remmer* cases. "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996).

## VI

■■■ The district court properly admitted testimony, including that of Davis, regarding the factual circumstances of Davis' encounter with Alexander and Rhodes and his consultation with Harding. In this situation such a "probing factual inquiry" was not only permissible but necessary. *Haley,* 802 F.2d at 1535 n. 1; Fed.R.Evid. 606(b). Nevertheless, when a party seeks to attack or support a verdict, Rule 606(b) prohibits all inquiry into a juror's mental process in connection with the verdict. *See Tanner v. United States,* 483 U.S. 107, 117–22, 107 S.Ct. 2739, 2745–49, 97 L.Ed.2d 90 (1987); *Stockton v. Commonwealth,* 852 F.2d 740, 743–44 (4th Cir.1988).

During the evidentiary hearing, the assistant United States attorney elicited Davis' view about the sufficiency of the evidence, asking Davis: "And did you listen to all of the evidence that was put forth by both sides and consider it in reaching your own personal verdict?" Davis replied, "Yes, sir." Cheek objected, citing Rule 606(b). The district court overruled Cheek's objection. *See Cheek,* 873 F.Supp. at 981. Later, when dismissing Cheek's petition because of its view that the presumption required by *Remmer I,* 347 U.S. at 229, 74 S.Ct. at 451, was inapplicable, the district court specifically relied on this testimony when it found "perhaps most importantly" that Davis had considered all the evidence in arriving at his personal verdict and that he had "joined with the other eleven jurors in reaching a verdict of guilty...." *Cheek,* 873 F.Supp. at 990.

■■■ By asking Davis whether he had listened to and considered all the evidence, the government was delving into Davis' mental processes about the sufficiency of the evidence in reaching his personal verdict. Such an inquiry exceeded the strict limits imposed by Rule 606(b). *See Tanner,* 483 U.S. at 118, 121–22, 107 S.Ct. at 2746, 2748–49; *see also United States v. Greer,* 620 F.2d 1383, 1385 n. 2 (10th Cir.1980); *Haugh v. Jones & Laughlin Steel Corp.,* 949 F.2d 914, 918 (7th Cir.1991). By relying on Davis' mental processes in connection with the verdict when formulating its findings of fact, the district court erred. In *United States v. Blumeyer,*

62 F.3d 1013, 1014–15 n. 1 (8th Cir.1995), the court said: "To the extent that the district court used testimony barred by Rule 606(b) to make its findings of fact, the court abused its discretion."

In violation of Rule 606(b), the district court again relied on Davis' testimony about his mental processes in connection with the verdict in its alternative holding as disclosed by the following passage in its opinion:

> Even if there were a presumption of prejudice it is not conclusive and the evidence at the hearing demonstrates that the juror listened to all the evidence and considered it in reaching his own personal verdict, and the Court finds that the evidence overcomes any presumption of prejudice.

*Cheek,* 873 F.Supp. at 990. Rule 606(b) at times makes it more difficult to determine whether a new trial is warranted. *See Stockton,* 852 F.2d at 743–44. But sound policy supports the rule and outweighs any inconvenience or difficulty the rule imposes. *See generally Tanner,* 483 U.S. at 121–27, 107 S.Ct. at 2748–51.

We need not speculate about Davis' mental condition when he sat on the jury after his encounter with Alexander and Rhodes. Major Harding's testimony provides us with contemporaneous information about Davis' mental condition during the trial. Major Harding testified that Davis said he was sitting on a jury and that he had been approached with a bribe. Davis was concerned, and he wanted to know what to do. He was concerned about his safety and his integrity. He was afraid if he reported the contact that people would think that maybe he had done something to cause him to be selected—that he had done something to make somebody think he would take a bribe. Davis was concerned to do his civic duty and do it fairly. Davis asked Major Harding to be a character witness if the need arose. Major Harding offered his assistance, but when Davis left he had not decided what to do. *See Cheek,* 873 F.Supp. at 981–82.

■ Major Harding's testimony, coupled with Davis' own testimony that he was devastated and fearful, shows that he was in no condition to sit on a jury involving a case in which he reasonably believed one of the defendants and his confederates had attempted to bribe him. Davis' condition was essentially similar to that of the juror in *Remmer II,* who is described in 350 U.S. at 381, 76 S.Ct. at 427–28 "as a disturbed and troubled man" from the date of the extrajudicial contact. As we have mentioned, the Court remanded that case for a new trial.

■ The district court stated that Davis had done his civic duty and put himself in a position to do it fairly. *Cheek,* 873 F.Supp. at 991. Regrettably, we cannot condone Davis' decision not to report immediately the extrajudicial contact to the trial judge as instructed. It was his civic duty to report. The importance of this duty cannot be overlooked. Had he told the judge what he told Major Harding, an alternate juror could have been substituted. The United States Attorney and government agents could have investigated and prosecuted the guilty parties while the evidence was fresh. The cloud on the verdict that this extrajudicial contact caused would not exist. The integrity of judicial proceedings and trial by jury would have been vindicated. The district court's finding that the juror did his civic duty is clearly erroneous. The juror's conduct cannot be depicted as an example of civic duty to other citizens who serve on juries.

After assessing all the evidence, we hold that the government's rebuttal is insufficient to overcome the presumption of prejudice raised by the devastating, improper, extrajudicial contact with Davis. Objectively, there is at least a reasonable possibility that the extraneous contact affected the verdict. *See Stephens,* 848 F.2d at 488–89; *Haley,* 802 F.2d at 1537–38.

We reverse the district court's judgment and remand for a new trial.

*REVERSED AND REMANDED.*