**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4327

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DONTAE SMALL,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge. (1:16-cr-00086-JKB-1)

Argued: October 31, 2019                    Decided: December 6, 2019

Before WILKINSON, KING, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:** Brandon Lee Boxler, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. Sandra Wilkinson, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Paresh S. Patel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland; David J. Debold, Travis S. Andrews, Raymond D. Moss Jr., GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. Robert K. Hur, United States Attorney, Paul A. Riley, Assistant United States Attorney, Charles Kassir, Law Clerk, OFFICE OF THE UNITED STATES

ATTORNEY, Baltimore, Maryland, for Appellee.

WILKINSON, Circuit Judge:

Following a six-day trial, a jury in the United States District Court for the District of Maryland found defendant-appellant Dontae Small guilty of federal carjacking, in violation of 18 U.S.C. § 2119(1); conspiracy to commit carjacking, in violation of 18 U.S.C. § 371; and destruction of government property, in violation of 18 U.S.C. § 1361.

In the proceedings below, Small made several motions relevant to the instant appeal, all of which were denied by the district court: (1) a motion for judgment of acquittal on the carjacking and conspiracy charges; (2) a motion to suppress evidence related to a cell phone search; and (3) a motion to excuse and question two jurors on Sixth Amendment grounds. Small now appeals these denials and requests that we vacate his convictions. Because we conclude that the district court did not err in denying these motions, Small's convictions are affirmed.

I.

A.

On October 4, 2015, Baltimore resident Brandon Rowe turned around and saw "a gun in my face." J.A. 181. Rowe and his fiancée had just returned from vacation to their house in Baltimore's Federal Hill neighborhood. It was after 10:00 pm, and there were no open parking spots in front of their home. They double-parked and quickly unloaded their car, a silver Acura TSX. Then Rowe drove off alone in search of parking while his fiancée went into the house. He parked the car in a spot roughly a block away and began walking back. Within a minute, Rowe was confronted by three masked men, one armed with a "gray silver gun." J.A. 182. The gunman demanded that Rowe hand over everything he had.

3

Rowe responded that he had only two sets of keys on him, his car keys and house keys. He handed over his car keys but told his assailants that he wasn't giving them his house keys. The men patted Rowe down and felt his pockets to confirm that he had nothing else of value. Throughout this entire interaction, the gun remained pointed at Rowe's face.

After taking Rowe's car keys, the gunman ordered Rowe to follow his assailants, who were walking toward the parked car. Rowe refused and instead turned around and walked home. His assailants did not pursue him. Rowe called 911 after arriving home, and officers responded rapidly. Later that night, Rowe was driven past the spot where he had parked his Acura. The car was gone.

Shortly before Rowe was confronted by his three masked assailants, an armed robbery took place in the same neighborhood. Around 10:00 pm, Hannah Caswell and Joe Dougherty were walking home from dinner. As Caswell and Dougherty were passing a white minivan parked on the street, a masked man holding a silver gun stepped out in front of them and blocked their path. He held the gun to Caswell's head and demanded that Caswell and Dougherty empty their pockets. When Dougherty refused to hand anything over "until the gunmen took the gun out of [Caswell's] face," J.A. 238, a second man came from behind the minivan and ripped open Dougherty's pocket, causing his cell phone to fall to the ground. The gunman picked up the phone and both assailants took off running. The white minivan pulled out of its parking spot and followed. Dougherty and Caswell used a neighbor's phone to call the police. Their descriptions of the silver gun and the assailants were consistent with Rowe's.

B.

4

On October 7, 2015, three days after the armed robbery and carjacking, a man later identified as Dontae Small drove a silver Acura into the Arundel Mills Mall parking lot shortly after 8:00 pm. Security cameras on the premises scanned the car's license plate, which revealed that it was Rowe's stolen Acura. Police were called, and officers from the Anne Arundel County Police Department set up a perimeter around the parked car and waited for its driver to return. Small returned to the parking lot at approximately 8:50 pm, unlocked the Acura, and got into the driver's seat. At this point, one of the officers pulled his marked squad car behind the Acura and activated his emergency equipment.

Rather than surrender, Small drove the Acura over a curb and fled the scene. Numerous officers followed in pursuit, and a high-speed chase ensued. After driving for nearly five miles, Small sped through the outbound gate at Fort Meade. Once inside Fort Meade, and with law enforcement still in pursuit, Small drove through a fence surrounding the National Security Agency ("NSA") facility and crashed down an embankment. Though officers arrived at the scene of the crash "within [a] minute," Small had disappeared. J.A. 63. Small would not be found until he emerged from a nearby sewer around 10:00 am the following morning.

Unable to immediately locate the driver of the Acura, police called for backup and began to set up a perimeter. Beginning at around 10:00 pm and continuing for over twelve hours, approximately 200 state and federal officers conducted an extensive search of the area. Appellant's Opening Br. at 9. During this time, the NSA was put "on a lock down" until authorities could locate the driver. Appellee's Br. at 28 (quoting Aff. in Supp. Search Warrant, Dist. Ct. Docket #25, Ex. A).

5

Though the authorities did not immediately locate Small, they did find several items of interest while searching the NSA grounds. At 1:45 am, officers found a black hat and a white t-shirt stained with blood near the crash site. Later, at 4:52 am, search personnel discovered a cell phone on the ground approximately fifty yards from the bloody shirt and hat. J.A. 30, 32-33. Detective William Bailey of the Baltimore City Police Department, the lead investigator on Rowe's carjacking, retrieved the phone and took it to a "floating command center." J.A. 30-31.

At the command center, NSA Special Agent Kristel Massengale observed that the cell phone was receiving calls from a person identified on the screen as "Sincere my Wife." J.A. 167-68. At 5:18 am, without obtaining a warrant, Agent Massengale used the phone to call "Sincere" back. Sincere, whose real name is Kimberly Duckfield, informed Agent Massengale that the phone belonged to her husband, Dontae Small. Police quickly obtained a photo of Small and found it matched security footage of the driver from the Arundel Mills Mall. Based on this evidence, police concluded that Small was likely the driver of the stolen Acura.

Throughout the early morning hours, officers used the cell phone three more times without obtaining a warrant. First, at 7:24 am, Detective Bailey called Duckfield and inquired into whether Small had returned home. Duckfield said no. Next, at 8:21 am, Duckfield called Small's phone. Bailey answered and informed Duckfield that police were looking for Small. Finally, Bailey removed the phone's back casing and battery to locate its serial number and other identifying information.

6

At approximately 10:00 am, Small emerged from the sewer system through a manhole "a little bit" away from the locations of the crash and scattered items. J.A. 42. Soon after, Small was spotted by NSA Police Officer Hugh McCall, who asked him to identify himself. Small responded by fleeing on foot. After a brief chase, Officer McCall caught Small and placed him under arrest.

In the weeks following Small's arrest, the government obtained three search warrants relating to his cell phone. The warrant applications contained Small's name and the phone's serial number—information that the government had learned from its use of the phone during the manhunt. The warrants authorized the government to collect: (1) the call history, text messages, internet browsing history, contacts, and deleted data from Small's phone; (2) the historical cell site location data for Small's phone; and (3) records of outgoing and incoming calls for a second cell phone that Small's phone had called on the day of the robberies. The government relied on evidence obtained pursuant to these warrants at Small's trial.

C.

After his arrest, Small was charged with the carjacking of Rowe's Acura, in violation of 18 U.S.C. § 2119(1); conspiracy to commit carjacking, in violation of 18 U.S.C. § 371; and destruction of government property for crashing through the NSA fence, in violation of 18 U.S.C. § 1361.

The district court empaneled a jury on October 16, 2017, with Small's trial set to begin the following day. The next morning, before proceedings began, jurors 5 and 11 approached the Courtroom Deputy to share their concerns that several individuals had been

7

"watching" them as they exited the jury room the previous evening. J.A. 49. The jurors noted that at least one of these individuals was carrying a cell phone, though they could not tell if any videos or photographs were taken. The Courtroom Deputy relayed these concerns to the district judge.

In response, the district judge took two steps. First, he ensured that court security officers ("CSOs") were posted outside both the courtroom and the jury room. Second, he directed the Courtroom Deputy to inform jurors 5 and 11 of the additional security measures and that any further concerns should be brought to the attention of the CSOs or the Courtroom Deputy. The district judge did not disclose the extra security precautions to the rest of the jurors, nor did he inform them of jurors 5 and 11's concerns. He believed that doing so could cause "more harm than good" by drawing attention to concerns that were "of a pretty vague nature" and possibly based on "misperceptions." J.A. 51-52. Immediately before opening statements, the district judge informed the parties of this situation. Small's counsel had no immediate objection to the remedial steps taken by the district judge.

Small's trial commenced as scheduled on October 17. The government presented testimony from Rowe, Caswell, Dougherty, law enforcement officers involved in the manhunt at the NSA, a forensic expert in cellular data analysis, and others. Much of this evidence sought to link Small to Rowe's carjacking. A friend of Small's, Jamia Butler, testified that Small had borrowed a white minivan from her on the day of the carjacking and armed robbery. She stated that Small told her he would be using the van to give his associate, Ronald Hall, a ride, and that she saw Small and Hall drive off together that day.

8

Caswell and Dougherty testified about the white minivan present during their robbery. The government later presented evidence that Hall resembled the gunman who accosted Rowe.

An expert in cellular analysis testified that Small and Hall's cell phones were used in the Federal Hill neighborhood around the time of the carjacking and robbery. Call data showed that the two were in constant communication that night, exchanging multiple calls and text messages. Shortly before masked assailants approached Rowe, Small sent Hall a text message that read: "Get da dude cpming down da st.i parked on . . . ." J.A. 599. The government also introduced incriminating excerpts from nine calls that Small made from state custody in 2016. J.A. 458; *see, e.g.*, J.A. 579-80 ("They said it was three people. All of them had on masks. . . . It was four individuals babe. . . . I was the driver."). On October 25, 2017, after the trial concluded, the jury found Small guilty of all three counts. He was sentenced to 324 months in prison.

D.

During the course of proceedings before the district court, Small made three motions relevant to the instant appeal. First, at the close of evidence, Small made a motion for a judgment of acquittal on the carjacking and conspiracy charges on the grounds that the government had failed to offer evidence sufficient to establish the *mens rea* element of carjacking under 18 U.S.C. § 2119. Specifically, he asserted that no reasonable juror could conclude that he or his coconspirators possessed § 2119's requisite "intent to cause death or serious bodily harm" during Rowe's carjacking. The district court denied Small's motion, finding that the government's evidence with respect to intent was sufficient to send the question to the jury.

9

Second, prior to trial, Small filed a motion to suppress evidence derived from or related to his cell phone. He asserted that the four warrantless searches of his phone violated the Fourth Amendment, rendering all evidence stemming from those searches—including his cell phone location data and text messages—inadmissible.[1] The district court denied Small's motion, concluding that no warrant was required for the searches because Small had abandoned his phone.

Third, shortly after trial began, Small moved to excuse and question jurors 5 and 11, based on concerns that the incident outside the jury room "would influence their verdicts in such a way that they would no longer be . . . fair and impartial jurors . . . ." J.A. 87-88. The district court declined to take either step, finding that the defendant's requested relief was not warranted based on the sparse information presented.

Small now appeals the district court's denial of these three motions.

II.

A.

Under 18 U.S.C. § 2119, a person commits the crime of federal carjacking if he or she, "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." *United States v.*

---

[1] At times, the government implies that its limited uses of Small's phone prior to obtaining a warrant did not qualify as searches for Fourth Amendment purposes. *See* Appellee's Br. at 14, 26-28. Because this issue was not fully briefed and ultimately does not impact our holding, we will simply assume for the purposes of our analysis that four warrantless searches of Small's phone occurred. *Infra* Section III.

*Foster*, 507 F.3d 233, 246-47 (4th Cir. 2007) (quoting *United States v. Applewhaite*, 195 F.3d 679, 685 (3d Cir. 1999)).

Section 2119's *mens rea* component, a specific intent requirement, is satisfied whether the defendant unconditionally or conditionally "inten[ded] to cause death or serious bodily harm," 18 U.S.C. § 2119, during a carjacking. *Holloway v. United States*, 526 U.S. 1, 8, 12 (1999). That is, the government need not prove that the defendant intended to cause death or serious harm "if unnecessary to steal the car," so long as it shows that "at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver *if necessary to steal the car . . . ." Id.* at 12 (emphasis added).

To establish conditional intent, the government must provide evidence above and beyond "an empty threat, or intimidating bluff" made by the defendant during the carjacking. *Holloway*, 526 U.S. at 11. Section 2119's "by force and violence or by intimidation" *actus reus* requirement remains distinct from its *mens rea* requirement: an empty threat would satisfy the former but not the latter. *Id.* at 11-12. If the defendant were unwilling to follow through on an intimidating bluff, then he would lack the intent "to seriously harm or kill the driver if that action had been necessary to complete the taking of the car." *Id.* With these points in mind, we turn to the facts of the case at hand.

B.

Small claims that there is insufficient evidence to sustain his conspiracy and carjacking convictions, and that the district court erred in denying his motion to this effect. Specifically, Small contends that the government failed to present sufficient evidence for

a reasonable juror to find that he or his coconspirators acted with "intent to cause death or serious bodily harm" as required by 18 U.S.C. § 2119.

A defendant who challenges the sufficiency of the evidence "faces a heavy burden." *Foster*, 507 F.3d at 245. A jury verdict will be sustained so long as "there is substantial evidence in the record to support it." *United States v. Wilson*, 198 F.3d 467, 470 (4th Cir. 1999). When evaluating the sufficiency of the evidence, "we view the evidence in the light most favorable to the government," *id.*, and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Small fails to carry his burden. There is substantial evidence in the record from which a reasonable juror could conclude that Small or his coconspirators intended to seriously harm or kill Rowe if necessary to steal his vehicle. The facts of this case are chilling: no ordinary vehicle theft took place here. Rowe was walking alone at night on a deserted street. He was accosted by three men—wearing masks—one of whom was holding a gun. The armed assailant demanded everything Rowe had while pointing the gun "in [his] face." J.A. 181. The gun would remain trained on Rowe, only a foot from his head, throughout the entire interaction. Furthermore, the assailants made physical contact with their victim; when Rowe said he had only keys on him, they "patted [him] down" and "felt in [his] pockets." J.A. 182-83. Even after Rowe's assailants had his car keys, they tried to make him follow them to another location. All of this evidence allowed the jury to infer that Small or his coconspirators possessed the intent to seriously harm or kill Rowe if necessary to steal his car.

12

Although juries evaluating intent are entitled to consider the entirety of the circumstances surrounding a carjacking, *see United States v. Fekete*, 535 F.3d 471, 481 (6th Cir. 2008), two facts are of particular note in the case at hand: (1) an assailant pointed a gun at Rowe; and (2) an assailant made physical contact with Rowe. First and foremost, an assailant's wielding a gun provides a strong indication of intent to inflict bodily harm if met with resistance, particularly when "the perpetrator[] did not merely display a gun . . . but rather pointed the gun at the [victim] in demanding car keys and other possessions." *United States v. Franklin*, 545 F. App'x 243, 249 (4th Cir. 2013); *see also United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017) (finding "plenty of evidence of . . . intent" when the defendant pointed a gun at the carjacking victim's head and threatened her); *Foster*, 507 F.3d at 247 (finding element of intent satisfied when the defendant held a gun to the victim's head, ordered him out of the car, and refused him reentry).

In addition, an assailant's physical touching of a victim during a carjacking—whether by hand or with a weapon—supports a jury's finding of intent. *See Franklin*, 545 F. App'x at 249 (finding that a defendant's "'grop[ing]' [of] one of the vehicle's passengers [while] searching for items to steal" supported the jury's finding of intent); *Fekete*, 535 F.3d at 478 (noting that courts often look to "whether there was physical violence or touching" to determine whether § 2119's intent requirement is satisfied). And while the gunman here did not touch his weapon to Rowe's head, he very nearly did so by pointing it from only a foot away. *See United States v. Adams*, 265 F.3d 420, 425 (6th Cir. 2001) (adopting a general rule that "physically touching a victim with a weapon, standing

13

alone, . . . indicates an intent on the part of the defendant to act violently" as required by § 2119); *cf. United States v. Bailey*, 819 F.3d 92, 97-98 (4th Cir. 2016) (declining to find § 2119's intent element satisfied when the defendant held an object to the victim's neck but there was no evidence that it was a weapon).

Small attempts to undermine the jury's finding by noting several characteristics of the carjacking at hand: first, Rowe's assailants did not verbally threaten him; second, the government did not present proof that the gun was loaded; and third, Rowe's assailants did not harm him when he failed to follow certain instructions. While it is true that these factors are relevant to intent, none are dispositive. They speak to evidentiary weight, a matter that belongs with the jury. *Jackson*, 443 U.S. at 318-19 ("Th[e] [sufficiency of the evidence] standard gives full play to the responsibility of the trier of fact . . . to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."); *Robinson*, 855 F.3d at 269.

Take the lack of verbal threats. While verbally threatening the victim can certainly help establish intent, *see Robinson*, 855 F.3d at 269, there is no bar to finding intent in cases that lack verbal threats, *see Foster*, 507 F.3d at 247. Indeed, it is difficult to imagine a more effective threat than holding a gun to someone's head. A reasonable juror in the case at hand could well conclude that Rowe's assailants were letting the gun do the talking.

Nor does the lack of proof that the gun was loaded decide this case. *Fekete*, 535 F.3d at 478 ("[T]he issue of whether a carjacker's firearm was loaded has generally not been treated by the courts as outcome-dispositive. Rather, the courts have looked at the totality of the relevant circumstances . . . ."). The carjacking statute does not require the

14

use of a loaded gun; it requires that a defendant have the "intent to cause death or serious bodily harm." 18 U.S.C. § 2119; *see also Fekete*, 535 F.3d at 480. Here, the government presented testimony from gun owner Caswell and military veteran Dougherty indicating that their masked assailant's weapon was real. Rowe believed so as well. And as too many crime victims know, even an unloaded firearm is capable of causing harm. *See Fekete*, 535 F.3d at 480 (noting the danger of pistol-whipping). Based on the evidence presented here, a reasonable juror could conclude that—even if Rowe's assailants carried an unloaded gun—"[they] nonetheless had the requisite conditional intent to cause death or serious bodily harm by other means (e.g., pistol-whipping or brute force)," *id.*

Finally, Small alludes to the fact that Rowe's assailants did not harm him when he failed to follow their instructions. But this is not persuasive. Under § 2119, the defendant's intent is examined as of "*the precise moment* he demanded or took control over the car." *Holloway*, 526 U.S. at 8 (emphasis added). Although Rowe refused to give his assailants his house keys, likely to avoid endangering his fiancée, he turned over his car keys instantly and without protest. A reasonable juror could conclude that this scenario would have played out differently, even tragically, if Rowe had also refused to turn over his car keys. Similarly, while Rowe refused to follow his assailants to an unknown location, this occurred *after* he had already handed over his car keys. A reasonable juror could conclude that Rowe's assailants felt no need to harm him at that point because they already had something of value—his car keys.

Small next argues that a finding of intent in the case at hand would place our circuit in conflict with others. As Small notes, two circuits have held that merely brandishing a

15

gun is insufficient as a matter of law to demonstrate an "intent to cause death or serious bodily harm," 18 U.S.C. § 2119. *Fekete*, 535 F.3d at 480-81 ("[I]n the absence of a physical touching or direct proof that the firearm was loaded, the government must establish 'brandishing-plus' in order to satisfy § 2119's specific intent element."); *United States v. Randolph*, 93 F.3d 656, 664 (9th Cir. 1996) ("We conclude that the brandishing of a weapon, without more, does not support an inference of specific intent under § 2119."), *abrogated by Holloway*, 526 U.S. 1 (1999).

As an initial matter, it is unclear that our holding conflicts with those of our sister circuits. To the extent that "more" than brandishing is required to establish intent, Rowe's assailants did not merely "brandish" a gun. They pointed and trained it at his head. They physically touched Rowe during the carjacking, when they patted him down. As such, the "brandishing-plus" test from *Fekete* would not apply: it is used "in the absence of a physical touching" of the victim. *Fekete*, 535 F.3d at 478, 480-81. If we have any disagreement with our sister circuits—and it is not clear we do—it is limited to precisely when the question of intent switches from one of fact for the jury, *see Robinson*, 855 F.3d at 269, to one of law for the courts. Put another way, after a jury has found § 2119's specific intent requirement satisfied and returned a verdict of guilty under unexceptional instructions, when can a court step in and proclaim that no reasonable jury could have reached that very conclusion? Jurors excel in cases such as this, where they are asked to apply their common sense to the factual scenario before them. Thus, we have cautioned that "[c]ourts must resist invading the jury's province by transforming questions of fact into matters of law." *Robinson*, 855 F.3d at 269. We decline to invade the jury's province here. The carjacking

16

and conspiracy charges against Small were properly submitted to the jury, and the jury returned a verdict of guilty.

Jury verdicts are entitled to respect. The jury here found that Small or his coconspirators possessed the "intent to cause death or serious bodily harm," 18 U.S.C. § 2119, when in the course of taking his car they demanded at gunpoint that Rowe hand over everything he had. We decline to overturn the jury's conclusion on this question of fact, since "it is clearly the jury's duty, not ours, to decide it." *Robinson*, 855 F.3d at 269.

III.

A.

We next address Small's Fourth Amendment challenge. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To safeguard this right, courts apply an exclusionary rule, which dictates that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347-48 (1974). Although warrantless searches are generally considered "*per se* unreasonable under the Fourth Amendment," this generality is subject "to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is abandonment. *Abel v. United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the Government's appropriation of . . . abandoned property."); *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) ("The law is well established that a person who voluntarily abandons

17

property . . . is consequently precluded from seeking to suppress evidence seized from the property.").

A finding of abandonment is based "not [on] whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." *United States v. Haynie*, 637 F.2d 227, 237 (4th Cir. 1980) (quoting *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1973)). To determine whether the defendant maintains a reasonable expectation of privacy in an item, the court performs "an objective analysis" which considers the defendant's actions and intentions. *United States v. Davis*, 657 F. Supp. 2d 630, 647-48 (D. Md. 2009), aff'd, 690 F.3d 226 (4th Cir. 2012). "Intent [to abandon] may be inferred from words spoken, acts done, and other objective facts." *Id.* at 648 (quoting *United States v. Hoey*, 983 F.2d 890, 892 (8th Cir. 1993)).

B.

Small contends that the district court erred in denying his motion to suppress the fruits of the warrantless searches of his cell phone. Specifically, Small alleges that there was insufficient evidence for the court to conclude that the phone was abandoned and that no warrant was required for the initial searches.

In reviewing a district court's denial of a motion to suppress, we review legal determinations de novo and factual findings for clear error. *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016). The government bears the burden of proving the admissibility of evidence obtained pursuant to a warrantless search by a preponderance of evidence. *See*

*United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974); *United States v. Helms*, 703 F.2d 759, 763-64, 766 (4th Cir. 1983).

In determining whether this standard is met, we may consider both the evidence before the district court at the suppression hearing and "evidence adduced at trial that support[ed] the district judge's ruling." *United States v. Han*, 74 F.3d 537, 539 (4th Cir. 1996); *see also Carroll v. United States*, 267 U.S. 132, 162 (1925). Still, there are temporal limitations on evidence used in our analysis: we evaluate whether the defendant intended to abandon an item using only objective information available to officers at the time they performed the warrantless search. *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (per curiam); *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996). As the Supreme Court has noted, the reasonableness of a search is evaluated based on "the facts known to the police" at the time. *United States v. Banks*, 540 U.S. 31, 39-40 (2003). A Fourth Amendment search "is good or bad when it starts." *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Abandonment should not be casually inferred. People lose or misplace their cell phones all the time. But the simple loss of a cell phone does not entail the loss of a reasonable expectation of privacy. Thus, such ordinary mishaps do not constitute "abandonments." Rather, as the district court noted, "[t]here has to be some voluntary aspect to the circumstances that lead to the phone being what could be called abandoned." J.A. 41. Here there clearly was.

The evidence before the district court depicts a fleeing suspect tossing aside personal items while attempting to evade capture. Small fled on foot after crashing through

the NSA gates, leaving his vehicle and its contents behind. Search personnel would continue to find Small's personal items strewn about during the manhunt. At 1:45 am, officers located a bloody shirt and hat in the vicinity of the crashed car. The obvious conclusion is that these items—or, at the very least, the shirt—were purposefully removed and tossed aside. Several hours later, around 5:00 am, officers located a cell phone only fifty yards from the shirt and hat. The phone was found in a grassy area, not on a sidewalk or "a place where [someone] normally might be." J.A. 43.

Based on these circumstances, the district court's inference that Small abandoned the phone seems sensible. Because a cell phone's GPS tracking can "lead you to a defendant," J.A. 39, it is credible that a fleeing suspect might intentionally discard his phone. And while phones occasionally slip out of pockets, shirts do not accidentally fall off their wearers—at the exact same moments as hats—and cars do not ditch themselves after a crash. The fleeing suspect's relinquishment of the car, the hat, and the shirt near where the cell phone was found support the district court's finding of abandonment.

The district court relied heavily on these circumstances to reach its conclusion that Small no longer had a "reasonable expectation of privacy in th[e] phone." J.A. 42-43. Small "is fleeing from the police, he crashes through a gate in a place where he is not supposed to be. He's clearly left the car. Items are being left behind, the bloody shirt and hat being

20

one of them." J.A. 42. Further, the court noted that there was no evidence Small attempted to retrieve his phone at any point, even though it wasn't password protected.[2]

Evidence gleaned from trial testimony points in the same direction. This testimony demonstrates why search personnel could reasonably conclude at the time of the search that the phone belonged to the suspect-at-large. While the government briefly noted at the suppression hearing that the NSA went on "lockdown" when Small crashed through the fence, J.A. 27, trial testimony from several search personnel gave a more complete picture of the scope of the manhunt. The testimony suggests that few people besides the suspect and search personnel were out-and-about in the hours before the phone was found.

As trial testimony established, the cell phone was found in a large crime scene, not in a crowded public area. An Anne Arundel police officer radioed during the car chase for "aviation assets" and "K-9 assets." J.A. 74. After Small entered Fort Meade but before he crashed through the NSA fence, an Army sergeant locked the Fort Meade gates and only reopened them to allow entry by search personnel. After the crash, an NSA police captain established a perimeter within the NSA and led a thorough, methodical search for the suspect. Search personnel could well believe that this phone—located during the early

---

[2] Citing *Riley v. California*, 134 S. Ct. 2473 (2014), Small contends that even if he abandoned his physical phone, he did not abandon its digital contents. Appellant's Opening Br. at 44-45. We do not find this argument persuasive. While *Riley* held that "the search incident to arrest exception does not apply to [digital information stored on] cell phones," it emphasized that "other case-specific exceptions may still justify a warrantless search of a particular phone." 134 S. Ct. at 2493-94. For the reasons noted, this is such a case.

morning hours in a grassy area in a facility on lockdown—belonged to the fleeing suspect who deliberately abandoned it during flight.

When Small discarded the phone, he ran the risk that complete and total strangers would come upon it. In tossing his phone, he relinquished his reasonable expectation of privacy in it as well. The district court's decision to deny suppression shall be affirmed.

IV.

A.

The Sixth Amendment guarantees a criminal defendant the right to be tried before an impartial jury. U.S. Const. amend. VI. In order to safeguard this right, the Supreme Court has held that "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954). If the *Remmer* presumption is met, the defendant is entitled to an evidentiary hearing in which the government bears the burden of showing "that such contact . . . was harmless to the defendant." *Id.* at 229-30; *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1535 (4th Cir. 1986).

Because it is difficult to fully shield juries from the outside world, *see Smith v. Phillips*, 455 U.S. 209, 217 (1982), we tolerate certain instances of extrajudicial contact that "amount to nothing more than innocuous interventions that simply could not justify a presumption of prejudicial effect," *Haley*, 802 F.2d at 1537 n.9; *see also Stockton v. Virginia*, 852 F.2d 740, 747 (4th Cir. 1988). Thus, in order to trigger *Remmer*'s presumption of prejudice, "the defendant must first establish both that an unauthorized

22

contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." *Stockton*, 852 F.2d at 743.

To determine whether a contact was innocuous, we "turn to the [five] factors the Supreme Court deemed important" in *Remmer*: "(1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996).

### B.

The day Small's trial began, jurors 5 and 11 approached the Courtroom Deputy with concerns that individuals outside the jury room had been "watching" them when they left the courthouse the previous evening. J.A. 49. The jurors did not indicate much else. Small contends that his Sixth Amendment right to an impartial jury was violated by the district court's failure to excuse and question jurors 5 and 11. For this reason, he requests that his convictions be vacated and his case remanded for a new trial.

We review the district court's decision not to question or excuse jurors after allegations of improper contact under "a 'somewhat narrowed,' modified abuse of discretion standard" that allows the appellate court "more latitude to review the trial court's conclusion" on the potential for prejudice. *Cheek*, 94 F.3d at 140 (quoting *Haley*, 802 F.2d at 1537 n.11-12); *see also United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009).

Under this standard, we see nothing problematic about the district court's denial of Small's motion to *voir dire* and excuse jurors 5 and 11. To invoke the *Remmer* presumption and the right to an evidentiary hearing, Small bore the initial burden of "introducing competent evidence that the extrajudicial communications or contacts were 'more than

23

innocuous interventions.'" *Cheek*, 94 F.3d at 141 (quoting *Haley*, 802 F.2d at 1537 n.9). He has failed to do so.

As an initial matter, it is hardly clear that a vague report of "watching," without more, constitutes evidence of "extrajudicial communications or contacts," *Cheek*, 94 F.3d at 141; *see also United States v. Baptiste*, 596 F.3d 214, 220-21 (4th Cir. 2010) (declining to reach the question of whether stares from a crowd constituted unauthorized contact). We are unaware of any case where a defendant attempted to invoke the *Remmer* presumption based on "watching" alone. "Watching" can hardly be described as "communication" or "contact," both of which imply an active exchange of information of some sort. Unsurprisingly, most precedent discussing extrajudicial contact involves spoken words. *See, e.g., Basham*, 561 F.3d at 316, 320 (juror called local news outlets about the trial before the jury reached a verdict); *Stockton*, 852 F.2d at 742-43, 746 (local business owner told the jurors that "they ought to fry the son of a bitch" in a death penalty case). Watching may be done passively and, unless context indicates otherwise, conveys little information.

Of course, "watching" may take on an extreme and sinister character, but here there is no evidence that it was anything "more than [an] innocuous intervention[]," *Cheek*, 94 F.3d at 141. The episode occurred in a common area of a busy courthouse. There was no reason for the jurors to associate the unknown individuals with Small. Indeed, there was no indication that the incident was in any way related to Small's case, "the matter before the jury," *Cheek*, 94 F.3d at 141.

"The trial court must be afforded wide discretion in handling matters relating to . . . the integrity of the jury." *United States v. Johnson*, 657 F.2d 604, 606 (4th Cir. 1981).

24

Here the district judge took reasonable steps based on the jurors' reports. He did not dismiss or trivialize their concerns. Instead, he increased security around the jury room. Further, he ensured that jurors 5 and 11 were aware of where to find security personnel, encouraged them to report any further concerns, and provided clear instructions on how to do so.

The district judge had good reason to be wary of a more searching inquiry. As he later noted:

> Stopping a trial to separately voir dire particular jurors about potential improper influence has its own potentially deleterious impact. Just that questioning process could plant in jurors' minds the notion that perhaps something untoward is afoot. . . . In this case, the totality of the information presented to the [c]ourt did not warrant th[is] sort of inquiry . . . .

J.A. 765. We agree. The judge took a measured, thoughtful approach to the jurors' concerns. These modest steps were proportionate to what the situation required. We find that the district court did not abuse its discretion by declining to question and excuse jurors 5 and 11.

V.

For the foregoing reasons, we reject Small's challenges to the proceedings below and affirm his convictions.

AFFIRMED